2019 IL App (1st) 182290
Nos. 1-18-2290 and 1-18-2429 (Consolidated)
Opinion filed June 27, 2019
Fourth Division

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* FAITH S., FREDERICK S. JR., and KELIS S., Minors | ) ) ) | Appeal from the Circuit Court of Cook County. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | Nos. 16 JA 857 16 JA 858 |
| v. | ) ) | 16 JA 859 |
| Allinia B. and Kewon S., | ) ) ) | |
| Respondents-Appellants). | ) ) ) | Honorable Bernard Sarley, Judge Presiding. |

PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justices Gordon and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1    Respondent Allinia B. appeals the trial court's order to terminate her parental rights to the minors, Faith S., Frederick S. Jr. (Frederick Jr.), and Kelis S., finding her unfit for failure to protect the children and based on her depravity. Allinia argues that (1) the trial court's decision was error and a violation of her due process rights, (2) the trial court's finding of unfitness is against the manifest weight of the evidence, and (3) the trial court's determination that it was in the best interest of the minors to terminate their mother's parental rights was against the manifest weight of the evidence.

¶ 2    Respondent Kewon S. appeals the termination of his parental rights as to Kelis based on an order finding him to be depraved. He argues that (1) the State did not prove he was depraved by clear and convincing evidence; (2) his due process rights were violated because he was found to be depraved based on his actions against Frederick Jr., where Kewon was not a party to that case or the named perpetrator; and (3) the finding of depravity did not meet the statutory requirements under section 1(D)(i) of the Adoption Act (750 ILCS 50/1(D)(i) (West 2016)).

¶ 3    Faith and Frederick Jr. are fraternal twins born August 10, 2010, to Allinia and Frederick S. Sr.[1] (Frederick Sr.). Kelis was born September 2, 2016, to Allinia and Kewon. Two additional maternal siblings, Miley P. and Melvin P. Jr., were part of the proceedings in the juvenile court but are not a part of the appeal and will be discussed as necessary to the background in this case.

¶ 4    On October 5, 2016, the State filed petitions for adjudication of wardship for each of the minors.

¶ 5    The petition for Frederick Jr. alleged that he was neglected under the Juvenile Court Act of 1987 (Juvenile Court Act) due to an injurious environment (705 ILCS 405/1-1 *et seq.* (West 2016)) and abused under the act because a person in the household inflicted physical injury upon him (*id.* § 2-3(2)(i)). The supporting facts for both allegations stated:

> "Mother has two prior indicated reports for inadequate supervision, cuts, bruises, welts, abrasions, oral injuries by abuse and substantial risk of physical injury/environment injurious to health/welfare by neglect. Father has one prior indicated report for inadequate supervision. On September 28, 2016 this minor presented at the hospital with abdominal pain. This minor was diagnosed with

___

[1] Frederick Sr. is not a party to this appeal. His parental rights to Faith and Frederick Jr. were terminated. He appealed, and we affirmed following his counsel's withdrawal from representation under *Anders v. California*, 386 U.S. 738 (1967). *In re Fa. S.*, No. 1-18-2292 (2019) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

internal trauma and a fractured hip. This minor was observed to have several injuries including a black eye. Minor states that his sibling's putative father caused the injuries and that mother was present when it happened. Medical personnel state that this minor was the victim of child abuse. Mother states that this minor was injured while in father's care. Parents state there is an issue of domestic violence between them. Parents are married."

¶ 6     The petition for Faith alleged that she was neglected under the Juvenile Court Act because her environment was injurious to her welfare under section 2-3(1)(b) of the Juvenile Court Act (*id.* § 2-3(1)(b)) and that she was abused based on a substantial risk of physical injury by other than accidental means under section 2-3(2)(ii) of the Juvenile Court Act (*id.* § 2-3(2)(ii)). The supporting facts for both allegations stated:

"Mother has two prior indicated reports for inadequate supervision, cuts, bruises, welts, abrasions, oral injuries by abuse and substantial risk of physical injury/environment injurious to health/welfare by neglect. Father has one prior indicated report for inadequate supervision. On September 28, 2016 this minor's sibling presented at the hospital with abdominal pain. This minor's sibling was diagnosed with internal trauma and a fractured hip. This minor's sibling was observed to have several injuries including a black eye. Minor's sibling states that his sibling's putative father caused the injuries and that mother was present when it happened. Medical personnel state that this minor's sibling was the victim of child abuse. Mother states that this minor's sibling was injured while in father's care. Parents state there is an issue of domestic violence between them. Parents are married."

¶ 7     A petition for adjudication of wardship for Kelis was also filed and alleged the same basis for neglect and abuse as in Faith's petition, neglect due to an injurious environment and abuse based on a substantial risk of physical injury. The supporting facts in her petition stated:

> "Mother has two prior indicated reports for inadequate supervision, cuts, bruises, welts, abrasions, oral injuries by abuse and substantial risk of physical injury/environment injurious to health/welfare by neglect. Presumed father has one prior indicated report for inadequate supervision. On September 28, 2016 this minor's sibling presented at the hospital with abdominal pain. This minor's sibling was diagnosed with internal trauma and a fractured hip. This minor's sibling was observed to have several injuries including a black eye. Minor's sibling states that this minor's putative father caused the injuries and that mother was present when it happened. Medical personnel state that this minor's sibling was the victim of child abuse. Mother states that this minor's sibling was injured while in presumed father's care. There is an issue of domestic violence between mother and presumed father. There is a presumed and putative father for this minor."

¶ 8     A temporary custody hearing was conducted on October 5, 2016, with all parents present. The parties stipulated to the facts alleged in the petitions, without prejudice, and the trial court made a finding of probable cause that the children were abused and neglected. The court found immediate and urgent necessity existed to support removal of the minors from the home. A temporary guardian was appointed for the minors.

¶ 9     On November 3, 2016, the State filed motions for all the minors to amend the adjudication petitions for the permanent termination of parental rights at the disposition hearing

and for the appointment of a guardian with the right to consent to adoption. In the motion for Faith and Frederick Jr., the State alleged that the parents were unfit because they acted in "[e]xtreme or repeated cruelty" toward the children in violation of section 1(D)(e) of the Adoption Act (750 ILCS 50/1(D)(e) (West 2016)), failed to protect the children from conditions in the children's environment injurious to their welfare in violation of section 1(D)(g) of the Adoption Act (*id.* § 1(D)(g)), and behaved in a depraved manner in violation of section 1(D)(i) of the Adoption Act (*id.* § 1(D)(i)). In Kelis's motion, the State alleged that the parents were unfit because they have failed to protect the children from conditions in the children's environment injurious to their welfare in violation of section 1(D)(g) of the Adoption Act (*id.* § 1(D)(g)) and behaved in a depraved manner in violation of section 1(D)(i) of the Adoption Act (*id.* § 1(D)(i)). The motions asserted that it would be in the minors' best interest to have a guardian appointed with the right to consent to adoption. The trial court granted the motions to amend the petitions for adjudication of wardship on December 20, 2016.

¶ 10    The adjudication and unfitness hearing was conducted over five dates between May and July 2018. The following evidence was presented at the hearing.

¶ 11    Wanda Gunn testified that she was employed as a child protection specialist with the Department of Children and Family Services (DCFS). She was assigned to investigate the case involving Faith and Frederick Jr. in September 2016. She initially met with the children in the emergency room at Stroger Hospital on September 28, 2016. She first spoke with Frederick Jr. She observed that he had a brace that covered his neck up to his nose and a brace on his right arm from shoulder to hand. She also observed a sore over one eyebrow and a lump on his head. Gunn further observed old marks on his legs; she described the marks as "like scars."

¶ 12    Gunn was able to speak with him a little bit because he was sleepy from medication. Frederick Jr. told her "that boy hit me." When Gunn asked the name of the boy, Frederick said "Kewon." Frederick Jr. told her his stomach hurt and that Kewon had twisted his arm.

¶ 13    Gunn then spoke with Faith. Faith told her that she was in the car with her mother and brother. Faith said her brother was choked by her "daddy." When Gunn asked Faith for her daddy's name, Faith responded "Kewon" and said she has two daddies.

¶ 14    Gunn also spoke with Frederick Sr. at the hospital. Frederick Sr. told her he did not know anything about Frederick Jr.'s injuries. Before that weekend, he had not seen his children in two years. He wondered why the mother dropped the children off on a weekday because they had school the next day. Allinia "abruptly" dropped the children off and then Frederick Sr. observed the marks on Frederick Jr. Frederick Jr. told his father that "Kewon" had hit him. Photographs of Frederick Jr.'s injuries were admitted into evidence.

¶ 15    Priscilla Cash testified that she was employed as a "DCP" investigator for DCFS and was assigned to investigate the case involving Faith and Frederick Jr. in September 2016. She saw the children at Stroger Hospital on September 30, 2016. She spoke with both children in the room. She observed that Frederick Jr. had bruises and knots on his face as well as a healing scab on his face. When she visited, Frederick Jr. did not have a neck brace.

¶ 16    Frederick Jr. told her he lived with his mother and his father Kewon. He was afraid of Kewon because when he got in trouble his mother would tell Kewon and then Kewon would "slap him, punch him, kick him." He told her that his mother and Kewon dropped him off at his father's house in the dark and left them. Frederick Jr. said he had been getting in trouble at school. During the car ride, his mother was driving and Kewon was punching him in the face with his fists and "slapping him." Frederick Jr. said Kewon threw him into the car seat. Frederick

Jr. told her that Kewon punished him by kicking, slapping, and punching him. Frederick Jr. demonstrated how he was injured during the car ride by pulling his wrist and leg back. Frederick Jr. told her that Kewon punched him in the stomach with a closed fist. He said his mother is present when Kewon hits him.

¶ 17    Cash also spoke with Faith at the hospital. Faith talked about how they were dropped off at their father's house and how her brother was "beat up in the car." Cash noted that Faith did not talk about herself, she talked about her brother. Faith told Cash that her father Kewon hurt her brother. Cash observed lots of scratches and bruises on Faith, especially on her face. Faith also said that her mother was present when Kewon struck Frederick Jr. and did nothing.

¶ 18    While at the hospital, Cash spoke with the twins' father Frederick Sr. in private. Frederick Sr. indicated that he had not seen the children in two years because of domestic violence issues between him and their mother. He said the children were dropped off in the hallway of his building in the dark and he heard the children "screaming and hollering." He went down to get them. When he saw the children, he observed the bruises and called the Chicago Police Department.

¶ 19    Cash later had a conversation with Allinia on October 3, 2016. Cash called Allinia because she needed more information for a safety plan for the children. Allinia told Cash that her other children were covered, but as far as the twins, their father's family could figure it out. Allinia stated that the children had no contact with their father for over 2½ years because of domestic violence. Allinia admitted that she and Kewon dropped the children off downstairs in a dark hallway of Frederick Sr.'s building. Allinia told Cash that when she dropped off the children, Frederick Jr. did not have any injuries. Allinia said that Frederick Jr. was "a thief, a liar,

he's manipulative, he turns over furniture at the school." Allinia described Frederick Jr. as "out of control."

¶ 20    Jennifer Contreras testified that she is employed by the National Youth Advocate Program and has been the caseworker for Faith and Frederick Jr. since November 2016. According to Contreras, the twins' father, Frederick Sr., has not sought any visits with the children or any services to help with reunification. She located him when he was incarcerated and tried to reach out with the facilitator at the jail.

¶ 21    According to Contreras, Allinia has not had any visits with Faith and Frederick Jr. Contreras staffs this case with the twins' therapist and/or her supervisor every other month. Since November 2016, Contreras has not been able to recommend supervised visits with the twins. She admitted that Allinia has requested visits with Faith and Frederick Jr.

¶ 22    Dr. Trenton Hubbard testified that he was employed at Stroger Hospital and was a third year child abuse fellow. He is licensed to practice medicine in Illinois. For his fellowship, he sees children to evaluate them for suspected physical or sexual abuse. Dr. Hubbard was qualified as an expert in pediatrics and child abuse pediatrics.

¶ 23    Dr. Hubbard treated Faith and Frederick Jr. in September 2016. He spoke with them in the same room in the inpatient pediatric unit on September 29, 2016. He observed swelling and redness around Frederick Jr.'s left eye. Frederick Jr. told him that Kewon had hit him. During their conversation, Faith did not offer any answers. Dr. Hubbard asked Frederick Jr. what Kewon had done, and Frederick Jr. responded that Kewon "punched him in the stomach and kicked him in the leg" as well as "hit his head against the back of a car seat." When Dr. Hubbard asked why Kewon did this, Frederick Jr. answered it was because he was sleeping. Frederick Jr. told the

doctor that Kewon had struck him before. Frederick Jr. also told Dr. Hubbard that his mother would hit him with a belt.

¶ 24    Dr. Hubbard performed a physical examination of Frederick Jr. In addition to the swelling around his left eye, the doctor observed a bruise. Frederick Jr. also had "some distention of his abdomen or protrusion of his abdomen." Frederick Jr. also had a skin rash on his chest. Both a CT scan and X-ray were done for Frederick Jr. The CT scan of his abdomen and pelvis disclosed a fracture of the right pubic ramus, which is in the pelvic girdle. Lab work was also done, including blood work, liver function tests, and a urinalysis. The results of the liver function test showed elevated markers, which were a sign of an internal organ injury. Additionally, his cardiac enzymes were almost five times higher than what would be expected, which is indicative of blunt trauma. The urinalysis revealed blood present in the urine. Dr. Hubbard testified that the results of the lab work supported the diagnosis of child physical abuse. In his expert opinion, Frederick Jr.'s pelvis injury was caused by an external force.

¶ 25    Dr. Hubbard also talked with Faith. He asked her why she was in the hospital, and she said because her mother dropped her and her brother off at her father's house. When asked what happened to Frederick Jr., Faith responded that Kewon "balled his fists and choked him and punched him." Dr. Hubbard asked Faith why Kewon did that, and she said it was because Frederick Jr. told Frederick Sr. where their school was. Faith told the doctor that she had been hit by Kewon and her mother. Both would hit her with a belt. Dr. Hubbard examined Faith's body and observed some hyperpigmented scars on her neck as well as an abrasion on her left ear. He asked her about the marks on her body, and Faith said her mother grabbed her and the abrasion on her was inflicted by Kewon. Faith had a loop mark on her chest that the doctor found

indicative of child physical abuse. The loop marks are the result of being struck with an implement, such as a cord or a belt.

¶ 26    Dr. Hubbard spoke with Frederick Sr. prior to meeting with the children. He asked Frederick Sr. about the events leading to Frederick Jr.'s admission to the hospital. Frederick Sr. told the physician that a female cousin dropped Frederick Jr. off at his house on September 22, 2016. He took care of the child for a few days and tried to contact the cousin to return the child, but was unsuccessful. Frederick Jr. remained at his house. On Wednesday, September 28, 2016, Frederick Jr. told his father where he attends school, so Frederick Sr. dropped Frederick Jr. off at school in the morning. When Frederick Sr. dropped Frederick Jr. off at school, he did not observe any visible bruises or marks on the child. Later that evening, he heard a knock on the door and found Frederick Jr. and Faith in the hallway. He looked out the window and saw Allinia and Kewon leaving. Allinia told him that the twins were now his responsibility. Frederick Sr. brought both children inside and then noticed the swelling on Frederick Jr.'s face.

¶ 27    Renee Heard testified that she was the DCFS case worker for Melvin Jr. and Miley since October 2016. She first spoke with the children on October 19, 2016. During that conversation, both children informed her that they were living with their mother, Allinia, instead of where they were supposed to be living with Latoya Powe. Melvin Jr. and Miley were removed from Powe and placed with their paternal grandmother and later returned to their father, Melvin Sr. Kelis, who had also been placed with Powe, was placed in a nonrelative foster home.

¶ 28    Heard also testified that she spoke with Allinia in September 2017 and asked her if she was pregnant. Allinia responded that she was not. Heard spoke with Allinia in May 8, 2018, outside the courtroom and asked Allinia if she had recently had a baby. Allinia told Heard that

Allinia's niece had used her medical card and had a baby. Heard testified that as the caseworker, it was her job to ensure any other children were safe.

¶ 29 Following Heard's testimony, the public guardian presented an exhibit of a birth certificate for a child born March 13, 2018, listing Allinia as the mother and the baby with the same last name as Kewon. The trial court admitted the exhibit over Allinia's objection.

¶ 30 Germelina Rambo-Harris testified that she was employed by DCFS as a child welfare specialist but previously was a child protection investigator from 2014 to 2016. In March 2014, Rambo-Harris was assigned to investigate a case involving Faith and Frederick Jr. During her investigation on March 10, 2014, she spoke with both children at school while in a private conference room. Frederick Jr. lifted his shirt and showed Rambo-Harris marks on his back. He did not say anything about the marks. Faith lifted her shirt, and Rambo-Harris observed marks on her stomach and back. Faith told Rambo-Harris that she had been "whooped" by her mother. Rambo-Harris also observed scratches on Faith's legs.

¶ 31 Also on March 10, 2014, Rambo-Harris spoke with Allinia over the telephone and later met with her in person. At the time, Allinia was living with Frederick Sr., twins Frederick Jr. and Faith, and her older children Melvin Jr. and Miley. When asked about Faith's marks, Allinia told her that Faith was hurt while the children were playing. Rambo-Harris informed Allinia that a doctor indicated that the marks appeared to be caused either a belt or an extension cord. Allinia responded that she did not hit Faith. Rambo-Harris testified that the four children were not living with Allinia on that date and had been placed with other relatives as part of a safety plan. The report was indicated for risk of harm and cuts, welts, and bruises. Intact services were put in place for the family. Rambo-Harris did not have any further involvement with the family.

¶ 32    The following witnesses testified on behalf of Allinia and Kewon. Powe testified that she was Allinia's cousin. She saw Frederick Jr. on September 22 and 28, 2016, at Allinia's house. Powe was helping after Allinia had just given birth to Kelis. On September 22, 2016, she took Frederick Jr. to his father Frederick Sr.'s house in her vehicle. On September 28, 2016, she took Frederick Jr. and Faith in her vehicle with Allinia to their father's house. At that time, Powe did not observe any marks on Frederick Jr. and he was not crying when he exited the vehicle. When she dropped Frederick Jr. off on September 22, 2016, he had a skin rash but had been given medication after a trip to the hospital. According to Powe, Kewon was not at Allinia's residence on September 28, 2016.

¶ 33    Powe had been the foster parent for Melvin, Miley, and Kelis, but she returned the children to live with Allinia. Melvin and Miley were subsequently placed with their father. A child protection warrant was issued for Kelis while she was supposed to be living with Powe.

¶ 34    Diana P. testified that she is the grandmother of Melvin Jr. and Miley. She has known Allinia for 14 to 15 years through Diana's son, Melvin Sr. At the date of the hearing, Melvin Jr. was 14 years old and Miley was 9 years old. Diana has observed Allinia parent the children. According to Diana, Allinia loves her kids. She dresses them nice and feeds them. She has never seen Allinia physically discipline or act cruelly toward Melvin Jr. or Miley. She has never been concerned for their well-being while in Allinia's care. She believed that Allinia kept her children safe. She also has never seen Allinia discipline Faith and Frederick Jr. or act cruelly toward them. Diana was aware that Frederick Jr. was admitted to Stroger Hospital on September 28, 2016, but was unaware that he had a fractured pelvis and bruises all over his face. She was also not aware that Faith stated her mother caused those injuries with a belt. Diana further did not know that Allinia was indicated for cuts, welts, and bruises to Faith in April 2014 and that

Allinia was found guilty of endangering the life of a child in September 2014 based on what happened to Faith.

¶ 35    Allinia also offered a stipulation that if called to testify Melvin Sr., father of Melvin Jr. and Miley, would state that he had supervised visits between Allinia and the children from December 2017 to May 2018 and that Allinia visited the children twice per month on average.

¶ 36    Several exhibits were admitted into evidence, including medical records, photographs, and DCFS indicated reports from 2012 and 2014. The 2012 DCFS report cited Allinia and Frederick Sr. for inadequate supervision because three children under the age of three were left unattended and Miley wandered outside alone for 5 to 45 minutes. The 2014 report indicated Allinia for causing substantial risk of serious injury based on serious marks on Faith. Allinia's 2014 certified conviction for endangering the life and health of a child was admitted. The State obtained an order of protection on Faith's behalf against Allinia.

¶ 37    Allinia offered several exhibits, including a parent coaching report and counseling records. The counseling records indicated that Allinia stopped attending sessions in March 2018 and that she continued to need therapy. She minimized concerns about her drug history, domestic violence, and relationship problems. A report from a parenting coach stated that Allinia showed positive parenting with Kelis, but the coach did not speak with the DCFS caseworker or review the assessment, the twins' medical records, or photographs.

¶ 38    On July 19, 2018, the trial court entered its order finding abuse and neglect. The court found the State proved physical abuse of Faith and that her mother was the perpetrator, citing Allinia's 2014 conviction for endangering the life of a child. The court also found Frederick Jr. to be physically abused and his mother was the perpetrator "in that she allowed it to happen and failed to intervene." The court did not believe Powe's testimony and rejected the argument that

Frederick Sr. caused Frederick Jr.'s injuries as speculation. The court then considered the allegations of torture and found that what Kewon did to Frederick Jr. fit the definition of torture. The trial court found that the State has proven to the torture of Frederick Jr. but did not name a perpetrator because Kewon is not Frederick Jr.'s parent.

¶ 39    The trial court further found:

> "Flowing from the Court's findings of physical abuse and torture, I find that the State has also proven neglect injurious environment and abuse substantial risk of injury as to all five of the minors. I find the mother to be the perpetrator of the abuse and neglect of those findings, and [Kewon] the perpetrator of neglect and abuse as to Kelis since that is his child."

¶ 40    The court then turned to unfitness and found Frederick Sr., Allinia, and Kewon unfit. Specifically, the court made a find of depravity against Frederick Sr. based on his criminal convictions. As to Kewon, the court found that the State proved depravity by clear and convincing evidence and reasoned, "What he did to Fred, Jr. clearly indicates an inherent deficiency of moral sense and rectitude, which is an accepted definition of depravity." The court found the State had not proven the allegation of lack of interest, concern, or responsibility as to Kelis's welfare and needed to show more evidence than what Kewon did to Frederick Jr. The court considered the three allegations of unfitness as to Allinia and found that the State had proven a failure to protect and depravity but did not prove extreme or repeated cruelty. In finding depravity by Allinia, the court stated the evidence showed Allinia "allowed [Kewon] to seriously beat her six-year-old son in front of her, didn't do anything about it, and then dropped her injured son off outside in front of the child [*sic*] father's home to basically fend for himself *** , and did so along with his twin sister."

¶ 41    At the end of the court's ruling, the public guardian argued that because Kewon had legal representation during the hearing he could be named as the perpetrator of physical abuse even though he was not the parent. The court noted the public guardian's argument.

¶ 42    The disposition and best interest hearing was conducted on July 31 and August 1, 2018. The following evidence was presented at the hearing.

¶ 43    Patricia Williams testified that she was a caseworker with DCFS and was assigned Kelis, Miley, and Melvin Jr. since June 13, 2018. She had been to visit Kelis's foster home, most recently within the last week. Williams found the home safe and appropriate with no signs of abuse or neglect or corporal punishment. During the visits, Kelis was not fully talking, but Williams played with her and Kelis would run around and "grab" for her foster parents. Kelis is not involved in any services, but she had an assessment and screening recently. Kelis might benefit from play therapy due to tantrums, but the foster mother thought Kelis could have anxiety from long travel times and would monitor her a little longer. Kelis's visits with Faith and Frederick Jr. are on schedule and occur twice a month. DCFS considers Kelis's placement to be preadoptive.

¶ 44    During her visits, Williams observed Kelis with the family. She was interacting with the boys and both foster parents. Both parents interact "in a real positive and nice way with Kelis."

¶ 45    Williams's recommendation was to have the parental rights terminated. Williams has not had contact with Allinia but has tried to contact her via phone and a letter. Kelis has not had visits with her mother. Williams has met Kewon and observed a visit with Kelis. Kewon has weekly visits with Kelis.

¶ 46    Jennifer Contreras testified as the caseworker for Faith and Frederick Jr. She has been their caseworker since November 2016. The twins are in a specialized foster home, which

requires a higher level of care than a traditional foster family. She visits three times a month, twice in the home. Her last visit was July 18, 2018, and she found the home safe and appropriate. Contreras did not see any signs of neglect or abuse or indications of corporal punishment, which has been a consistent finding over the two years.

¶ 47 Frederick Jr. is involved in individual therapy and medication monitoring, including psychotropic medication. His therapist is Amy Joslin; she sees both children. Frederick Jr. is enrolled in school and would be entering third grade. Contreras has observed him interact with his foster mother. He is "very affectionate" toward her, which was progress because in the beginning he was not very kind, including name calling, being rude, and swearing. Contreras no longer observes that behavior. The interactions between Faith and her foster mother are loving, caring, and trusting. Faith is also going into third grade. Faith receives individual therapy. Contreras does not provide services to Allinia or Frederick Sr. because she is the children's caseworker.

¶ 48 Contreras testified that her agency does not recommend visits between the twins and Allinia because the therapist does not feel it is clinically appropriate for them to visit. She has not had any contact with Frederick Sr. in approximately a year. Contreras asked the twins a couple of months earlier if they were happy living in the foster home and if they wanted to remain there; both children responded yes. Contreras testified that her agency wants the parental rights terminated for both parents. As for Allinia, Contreras wanted her rights terminated because of the abuse the children have endured and the trauma that they are trying to get over. The children are in a positive and stable placement and Contreras believes they deserve to be there. She recommends termination for Frederick Sr. because he has not been willing or able to visit the children, has not had any contact, or has not been assessed for services. She considers the home

to be preadoptive. She recommends the foster mother be given the opportunity to adopt Faith and Frederick Jr. Contreras testified it was her agency's position that it was in the children's best interest to terminate the parental rights.

¶ 49     Joslin testified that she was employed as the clinical director for the National Youth Advocate Program and has been the therapist for Faith and Frederick Jr. since November 2016. Joslin meets with the children weekly at their foster home. She meets with each child individually for 45 minutes and then 30 minutes with a combination of the children and their foster mother. When she began treating the twins, she gave each of them a mental health assessment, which is an assessment to review social history; observe their current symptoms; talk to the children, their caseworker, and their foster parent; and take this information to come up with a diagnosis and treatment recommendations.

¶ 50     Frederick Jr. was diagnosed with post-traumatic stress disorder (PTSD), intermittent explosive disorder, and attention deficit hyperactivity disorder (ADHD). As related to PTSD, Frederick Jr. is hypervigilant to danger in his environment, looking for danger sounds, sights, and people. He also avoids thinking about or talking about traumatic events, but he has nightmares about his trauma. Frederick Jr. also has angry outbursts and can be physically aggressive toward people and has difficulty calming down. For ADHD, he has trouble paying attention, difficulty focusing, and sitting still, even with things he likes to do such as playing a game or watching television. His treatment goals were to reduce the symptoms, in particular the risk-taking behavior and aggressive symptoms. She was also trying to reduce the "disregulated behaviors" using "trauma-focused cognitive behavioral therapy to teach him skills to free his overwhelming thoughts and feelings related to his trauma." During the first year of therapy, Frederick Jr.'s episodes of aggressive behavior have decreased in frequency and intensity.

Frederick Jr. has been able to identify traumatic events, including being "beat up in the car," and generally about being beaten in the home and being threatened by Kewon with a gun. Frederick Jr. rarely brings up his mother and when asked about her, he becomes agitated and tries to change the subject. Joslin continues to work on relaxation and coping skills for his behavior.

¶ 51 After Faith's mental health assessment, she was diagnosed with PTSD. She has avoidance symptoms. Joslin is working with Faith to decrease her emotional disregulation, such as being overwhelmed. Faith will "flop" on the floor and cry. She can be aggressive and hit others, but her main issue is having a tantrum. Faith's treatment goals are to work on her personal communications skills and express her needs and feelings in an age appropriate way.

¶ 52 Faith has identified traumatic moments, for example, when she was "beat up at home," left alone with older siblings without food, and Kewon having a gun and threatening Frederick Jr. and her. Joslin has also worked on relaxation and coping skills with Faith because while her symptoms have decreased in frequency and intensity, they are still present and negatively impacting her life.

¶ 53 Joslin has had contact with Allinia once over the phone and once in person at a team meeting with Allinia, Contreras, Contreras's supervisor, and Joslin. Allinia expressed that she wanted to have visits. Joslin had previously decided with Contreras and her supervisor that visits would not be in the children's best interests because Allinia did not take any responsibility for the children's trauma and the children needed to be both physically and emotionally safe. When asked about the events leading to the children being removed, Allinia said that she dropped the children off at Frederick Sr.'s house and she did not know how they got injured.

¶ 54 Joslin testified that her contact with the twins' foster mother has been cooperative and the foster mother seeks out strategies for the children's behavior and works to implement the

strategies. Joslin has discussed how trauma can affect a child's brain and that the children can regress and act younger than their age. Joslin described the children as "very attached" to their foster mother and look to her for comfort. Faith can be "physically very clingy." The children are also attached to the foster mother's boyfriend.

¶ 55    Nancy M. testified that she had been the foster parent for Kelis for over 22 months. She resides in a Chicago suburb with her husband, her mother, and two biological sons, aged 14 and 8.

¶ 56    Kelis is not involved in any services through DCFS. Kelis had received a developmental screening with the possibility she might need play therapy for anxiety. Nancy was open to making sure Kelis received the services if necessary. Nancy described Kelis's development, "She's been thriving. She's very intelligent, playful, loving, kind, silly, agile. She's just a joy. She is developing fine." According to Nancy, both of her biological sons love Kelis and the children play with each other. Nancy's mother also helps to raise Kelis and Kelis runs to Nancy's mother. Kelis is talking, and Nancy testified Kelis was on the "verge of language explosion." Nancy described Kelis as "playful," where she likes to hide around the corner of a hallway to scare someone and she laughs.

¶ 57    Nancy testified that Kelis has visits with Faith and Frederick Jr. twice a month and she is open to keeping sibling contact active in the future. Kelis has only seen Miley and Melvin Jr. once, but Nancy is open to continued contact with the siblings. Nancy wants the visit with Kelis's siblings to continue because "it is just a very important connection for her to have."

¶ 58    When asked about the possibility of adoption, Nancy responded that they "would love to have her in our family." The family loves her, and "she fits right in." Their extended family is very connected to her. When asked if she would allow contact with Allinia and Kewon after

adoption, Nancy responded that it would depend on the safety of the situation. Kelis has had consistent visits with her mother while in Nancy's care. Nancy does not participate in the visits, a DCFS transporter takes Kelis to the visits with Allinia. Kelis has also had visits with Kewon.

¶ 59    Iris C. testified that she has been the foster parent for the twins, Faith and Frederick Jr. for about two years. The family lives in Chicago. The children were attending summer camp at the time of the hearing and would begin third grade in the fall. Both children have individualized education plans (IEP) in place.

¶ 60    The IEP for Frederick Jr. established that he has a learning disability and is delayed. When he first came to Iris's home, Frederick Jr. could not read or write and was unable to "stabilize his behavior long enough to concentrate in the classroom." Iris testified that Frederick Jr. was now reading and writing at a kindergarten level. When asked how she has tried to help Frederick Jr., Iris responded that at first she was at a loss because Frederick Jr. becomes easily distracted due to ADHD, but now with the IEP, she follows through with homework and other items the teachers tell her to do. She was using flash cards to help him learn words and to begin writing them. She helps him write his alphabet every day and write the words she has given him.

¶ 61    For Faith, her IEP did not require addressing behavior problems, but she needed help with reading and writing. The IEP was to determine if she needed to be in a separate classroom like Frederick Jr. or if she could be in an inclusive classroom. Faith is integrated into her classroom and has a special class for an hour per day for reading and writing. Iris testified that Faith has improved and now "excels." She has almost caught up to her classmates for their grade level. Iris testified that Faith is getting better at doing her work. Faith can write a simple sentence at a first grade level.

¶ 62    As for behavior, Iris described Frederick Jr. as scared and "terrified of any man" that was Iris's family or friend. She stated that Frederick Jr. was "shaking" when he first met Iris's boyfriend. Frederick Jr. screamed every night for the first two weeks and was terrified, kicking the doors. Iris was able to speak with Frederick Sr. who helped to calm Frederick Jr. down. Iris testified that there was no contact with Frederick Sr. at that time and that it had been over a year. In addition to ADHD, Frederick Jr. has been diagnosed as bipolar and has PTSD. He has been taking medication for treatment.

¶ 63    Iris described Faith as "extremely clingy" when she first moved in with Iris. Faith needed to be held all the time and wanted to be talked through basic things. Faith was also aggressive and would hit and kick Iris. Now, Faith is calmer but is still clingy and needs attention. When the twins first came to Iris, they would often fight. It was mostly initiated by Frederick Jr. and sometimes started as playing that would escalate to a fight. Iris described them now as average seven-year-olds who "pick" at each other over silly stuff.

¶ 64    In the two years the twins have been with Iris, she has taken them to Atlanta for a family reunion, family picnics, and holidays. They are included in Iris's family. During the school year, the children are enrolled in after school programs to keep them busy and engaged with other children. When they come home, they have dinner, do homework, shower, and get ready for bed. On the weekend, they go to the park or play with other children.

¶ 65    When asked what she likes most about Faith, Iris answered that she had three boys of her own and likes that Faith is "a girly girl" with a personality. She likes that Faith has been "able to overcome some of the obstacles in her life" and that she will talk about it. Faith hugs a lot and has some compassion. Faith now makes an effort to keep her room clean and she follows the rules.

¶ 66    In response to the same question about Frederick Jr., Iris responded that he has "a real strong sense of himself as far as what he wants out of life." She is glad he can "think forward enough to know what it is that he wants out of life." She likes his personality. He comes up and hugs her and sometimes "lets down his little shield" and opens up and is able to share things he likes doing.

¶ 67    Both children have been seeing a therapist, Joslin, for two years. They see her every Monday. Iris testified that she would like to adopt the twins because her children are almost grown. She works in child care and taking care of kids is her passion. She has fallen in love with them. She has "come to care about their outcome" and she really wants "to see them grow up to have some type of stability in their life." Iris testified that would give her joy. She was willing to be legally and financially responsible for the twins and would support them as adults.

¶ 68    Iris testified that she would allow contact between the twins and Frederick Sr. because they have a positive relationship with him and he seems supportive. Iris did not know if she would allow contact with Allinia because she does not know her. Iris would be concerned based on the one contact with her on the phone. The phone call "shut them down and it literally took them two or three weeks to get back on base." They started acting out, becoming impulsive, and fighting a lot after the one conversation. The children visit with Kelis twice a month and have seen Melvin Jr. and Miley once every six months or so. She is open to continuing contact if she adopted the twins. The children have had many visits with a paternal aunt, and Iris was open to continuing visits.

¶ 69    About a year after the twins had been placed with Iris, Frederick Jr. began talking about the incidents of abuse. He told her that someone held a gun to his head and threatened him. He spoke about being "whooped" with a belt by Kewon.

¶ 70    In October 2018, the trial court found that all five minors be adjudged wards of the court as being in the best interest and welfare of the minors and the public. The court found Allinia to be unable and unfit to care for, protect, train or discipline the minors. The court also found Kewon unable and unfit in regard to Kelis. Frederick Sr. was also found unable and unfit to care for Faith and Frederick Jr.

¶ 71    Regarding the best interests of the children, the court found it was in the best interest of Faith, Frederick Jr., and Kelis to terminate the parental rights of Allinia. The court stated:

> "That would be based on the evidence in this case, which took place over many, many days in which he was present during the very disturbing evidence—events with regard to what happened to Faith and Frederick.
>
> And specifically the injuries to Frederick that she was present for in the car and then dropping the minor off—minors off as she did. Those specific facts and the other evidence in this case, in my view, warrants the termination of her parental rights.
>
> With regard to those three minors, they are also in foster homes now where they're well cared for. They're doing much better. And it's clear to me that it's in the best interest of those three minors to terminate the mother's parental rights."

¶ 72    The termination orders for Faith, Frederick Jr., and Kelis found that Allinia was unfit by clear and convincing evidence based on failure to protect and depravity.

¶ 73    The court further found it was in Faith and Frederick Jr.'s best interest to terminate Frederick Sr.'s parental rights based on his little to no contact with them for two years. The court observed that the twins have made "tremendous progress" in Iris's care. The termination orders

for Faith and Frederick Jr. found that Frederick Sr. was unfit by clear and convincing evidence based on depravity.

¶ 74    As for Kelis, the court found that it was in her best interest to terminate Kewon's parental rights. The court noted that while Kewon has been visiting Kelis, "the facts which persuaded me to find that [Kewon] was unfit are shocking and extremely disturbing." The court also acknowledged that Kelis is "very well cared for" in her foster home and is "thriving in their care." The termination order found that Kewon was unfit by clear and convincing evidence based on depravity.

¶ 75    This appeal followed. Allinia filed timely a notice of appeal on October 22, 2018, listing the order terminating her parental rights for Faith, Frederick Jr., and Kelis. Kewon filed a timely notice of appeal on November 13, 2018, listing the order terminating his parental rights for Kelis. Accordingly, this court has jurisdiction of both appeals regarding the termination of parental rights for Allinia and Kewon under Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994).

¶ 76    The Juvenile Court Act governs the proceedings in which minors may be removed from the care and custody of their parents, made wards of the court, and if necessary, have their parental rights terminated. 705 ILCS 405/1-1 *et seq.* (West 2016). At an adjudicatory hearing, the trial court shall hear the evidence and find whether the minor is abused, neglected, or dependent. *Id.* § 2-21(1). At the dispositional hearing, the trial court shall determine whether it is in the best interests of the minor and the public that he or she be made a ward of the court, and, if the minor is to be made a ward of the court, the court shall determine the proper disposition best serving the health, safety, and interests of the minor and the public. *Id.* § 2-22(1). "The purpose of the dispositional hearing is usually not to terminate parental rights but 'to decide what further actions are in the [minor's] best interests' and to 'give the parents fair notice of what they must do to

retain their rights to their child.' " *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 43 (quoting *In re G.F.H.*, 315 Ill. App. 3d 711, 715 (2000)).

¶ 77    Nevertheless, the Juvenile Court Act allows for an expedited termination determination at the initial disposition hearing "if all of the following conditions are met": (i) "the original or amended petition contains a request for termination of parental rights and appointment of a guardian with power to consent to adoption"; (ii) the abuse, neglect, or dependency of the minor has been found by a preponderance of the evidence; (iii) parental unfitness has been found by clear and convincing evidence; and (iv) "the court determines in accordance with the rules of evidence for dispositional proceedings" that (A) it is in the best interest of the minor and the public for the minor to be made a ward of the court, (B) reasonable reunification efforts are inappropriate or were unsuccessful, and (C) termination of parental rights is in the minor's best interest. 705 ILCS 405/2-21(5) (West 2016).

¶ 78    The termination of parental rights is a two-step process. First, the State must prove by clear and convincing evidence that the parent is "unfit" as defined by section 1(D) of the Adoption Act. 750 ILCS 50/1(D) (West 2016); 705 ILCS 405/2-29(2) (West 2016). "Parental unfitness must be proven by clear and convincing evidence." *In re Adoption of K.B.D.*, 2012 IL App (1st) 121558, ¶ 196. Second, "[a]ssuming the parent is found unfit, the circuit court must then consider whether it is in the best interests of the children to terminate parental rights." *In re J.B.*, 2014 IL App (1st) 140773, ¶ 49. " 'A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence.' " *Id.* (quoting *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005)). "On appellate review, this court 'will not disturb a finding of unfitness unless it is contrary to the manifest weight of the evidence and the record clearly demonstrates that the opposite result was proper.' " *Id.* (quoting *In re Konstantinos H.*,

387 Ill. App. 3d 192, 203 (2008)). "We give great deference to the trial court's finding of unfitness, defer to the trial court's factual findings and credibility assessments, and will not re-weigh the evidence anew on appeal." *Id.*

¶ 79    We first address the respective arguments by Allinia and Kewon that the trial court's findings of unfitness were against the manifest weight of the evidence. Specifically, Allinia contends that the State failed to show a series of acts or a course of conduct of abuse to support the unfitness findings based on failure to protect the children from conditions in their environment injurious to their welfare and depravity. See 750 ILCS 50/1(D)(g), (i) (West 2016). Similarly, Kewon asserts that the State did not prove he was depraved by clear and convincing evidence and failed to adhere to the statutory requirements for depravity under the Adoption Act.

¶ 80    Kewon argues that a finding of depravity can only be met if the statutory definition has been proven and the definition is not applicable as to him. Section 1(D)(i) of the Adoption Act does not define depravity, but rather it sets forth a rebuttable presumption of depravity if a parent has been convicted of several enumerated offenses or if the parent has been convicted of at least three felonies. *Id.* § 1(D)(i). However, the State did not rely on these presumptions in alleging depravity.

¶ 81    The Illinois Supreme Court has defined depravity as " ' " 'an inherent deficiency of moral sense and rectitude.' " ' " *In re Donald A.G.*, 221 Ill. 2d 234, 240-41 (2006) (quoting *In re Abdullah*, 85 Ill. 2d 300, 305 (1981), quoting *Stalder v. Stone*, 412 Ill. 488, 498 (1952)). "Our courts have held that depravity may be shown where a parent engages in a course of conduct indicating a moral deficiency and an inability to conform to accepted morality." *In re J.V.*, 2018 IL App (1st) 171766, ¶ 241. "Illinois courts have required that, in order to establish unfitness, clear and convincing evidence of depravity must be shown to exist at the time of the petition, and

the 'acts constituting depravity *** must be of sufficient duration and of sufficient repetition to establish a "deficiency" in moral sense and either an inability or an unwillingness to conform to accepted morality.' " *In re J.A.*, 316 Ill. App. 3d 553, 561 (2000) (quoting *In re Adoption of Kleba*, 37 Ill. App. 3d 163, 166 (1976)).

¶ 82    Since depravity may be established by means other than criminal convictions, Kewon's argument lacks merit. Thus, we turn to whether the State proved both Allinia and Kewon were depraved by clear and convincing evidence. We note that the trial court found Allinia unfit based on two grounds, environment injurious to the child's welfare and depravity, but if the State sufficiently proved depravity, we need not reach the other ground. See *In re J.B.*, 2014 IL App (1st) 140773, ¶ 49.

¶ 83    Allinia contends that the finding of depravity was based on Kewon's physical abuse of Frederick Jr., but she was unable to stop Kewon's abuse and her action in dropping the children off at their father's house does not support a finding of depravity. Kewon asserts that the finding of depravity was not based on actions committed against his own child but against Frederick Jr. Kewon further argues that the State failed to prove that the actions committed against Frederick Jr. were of a sufficient duration or repetition to prove depravity.

¶ 84    Here, the trial court's conclusion was not against the manifest weight of the evidence. At the hearing, the evidence established depravity by both Allinia and Kewon. The totality of the evidence showed a pattern of abuse by both Allinia and Kewon toward Frederick Jr. and Faith.

¶ 85    On September 28, 2016, six-year-old Frederick Jr. was admitted to the hospital after his father observed bruises and swelling on his face. Both Frederick Jr. and Faith had been left by Allinia and Kewon at their father's house without prior notification, and Allinia told Frederick Sr. that the children were now his responsibility.

¶ 86    At the hospital, Frederick Jr. was examined by Dr. Hubbard, an expert in child physical abuse. He observed that Frederick Jr.'s abdomen was distended and a CT scan of his abdomen and pelvis disclosed a fracture of the right pubic ramus, which is in the pelvic girdle. Lab work showed signs of an internal organ injury and blunt trauma. The urinalysis revealed blood present in the urine. Both children told him that Frederick Jr.'s injuries were caused by Kewon punching and hitting the child. Dr. Hubbard testified that the results of the lab work supported the diagnosis of child physical abuse. In his expert opinion, Frederick Jr.'s pelvis injury was caused by an external force.

¶ 87    Dr. Hubbard also examined Faith and observed some hyperpigmented scars on her neck as well as an abrasion on her left ear. He asked her about the marks on her body, and Faith said her mother grabbed her and the abrasion on her was inflicted by Kewon. Faith had a loop mark on her chest that the doctor found indicative of child physical abuse. The loop marks are the result of being struck with an implement, such as a cord or a belt.

¶ 88    DCFS employees Gunn and Cash each testified about their observations of Frederick Jr.'s injuries and conversations with both Frederick Jr. and Faith. Gunn investigated the case on September 28, 2016, and observed Frederick Jr. with a neck brace that covered up to his nose and an arm brace from shoulder to hand. Though medicated, Frederick Jr. told her that Kewon had hit him and twisted his arm. Faith told her that Kewon had choked Frederick Jr. Cash investigated the case on September 30, 2016, and observed bruises and knots on Frederick Jr.'s face. Frederick Jr. told her that Kewon had punched and hit him and threw him into the car hitting his head on the car seat. Frederick Jr. expressed being afraid of Kewon and told Cash that he would be punished by Kewon at home, including being slapped, punched, and hit.

¶ 89    In 2014, Allinia was convicted of endangering the life of a child for abuse of Faith. Rambo-Harris testified that she had previously been assigned to investigate a case involving Faith and Frederick Jr., who were three years old at the time. During her investigation on March 10, 2014, she spoke with both children at school while in a private conference room. Frederick Jr. lifted his shirt and showed Rambo-Harris marks on his back. He did not say anything about the marks. Faith lifted her shirt and Rambo-Harris observed marks on her stomach and back. Faith told Rambo-Harris that she had been "whooped" by her mother. Rambo-Harris also observed scratches on Faith's legs.

¶ 90    Additionally, both children told DCFS employees and Dr. Hubbard that this type of physical beating had occurred previously. Both children mentioned that Kewon had threatened them with a firearm.

¶ 91    The evidence of the physical abuse inflicted on Frederick Jr. and Faith was significant and sufficient for the trial court to find depravity based on a course of conduct indicating a moral deficiency and an inability to conform to accepted morality by both Allinia and Kewon. Accordingly, the trial court's finding of unfitness based on depravity for both Allinia and Kewon was not against the manifest weight of the evidence. Since a basis for unfitness is supported by the finding on a single ground, we need not reach whether the trial court's finding of environment injurious to a child's welfare was proven against Allinia.

¶ 92    Next, we consider Allinia's argument that the trial court's determination that it was in the best interest of the children to terminate her parental rights was against the manifest weight of the evidence. Kewon has not challenged the best interest finding regarding Kelis.

¶ 93    "Once a parent has been found unfit pursuant to one or more grounds set out in the Adoption Act (750 ILCS 50/1(D) (West 2016)), the State must establish by a preponderance of

the evidence that it is in the minor's best interest to terminate parental rights." *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 97. Following an unfitness finding, the trial court focuses on the needs of the child in determining whether the parental rights should be terminated. *In re J.V.*, 2018 IL App (1st) 171766, ¶ 249. "In determining the best interests of a child, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* " 'A child's best interest is superior to all other factors, including the interests of the biological parents.' " *Id.* (quoting *In re Curtis W.*, 2015 IL App (1st) 143860, ¶ 52).

¶ 94     In determining the best interest of a child under the Juvenile Court Act, the following factors shall be considered in the context of the child's age and developmental needs: (1) the physical safety and welfare of the child, including food, shelter, health, and clothing; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including (i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued), (ii) the child's sense of security, (iii) the child's sense of familiarity, (iv) continuity of affection for the child, and (v) the least disruptive placement alternative for the child; (5) the child's wishes and longterm goals; (6) the child's community ties, including church, school, and friends; (7) the child's need for permanence, which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2016).

¶ 95 "Additionally, the court may consider the nature and length of the child's relationship with her present caretaker and the effect that a change in placement would have upon her emotional and psychological well-being." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. "The court's best interest determination not need contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *Id.* We will reverse the trial court's finding that termination of parental rights is in a minor's best interest only if it is against the manifest weight of the evidence. *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 97.

¶ 96 Allinia contends that the trial court's finding in the best interest of the children was against the manifest weight of the evidence because she sought visitation with all children, even though DCFS did not approve visitation with Faith and Frederick Jr., she completed parenting coaching, and she saw a therapist. She asserts that DCFS and the twins' therapist "conspired to deny contact" between her and the twins "so that the children would bond to the foster parent and the agency could recommend termination of parental rights and the right to consent to the adoption of her children." These assertions fail to consider the best interest factors set forth in the Juvenile Court Act but instead look more at Allinia's best interest.

¶ 97 The evidence presented supports the trial court's finding that it was in the children's best interest to have the parental rights terminated. Faith and Frederick Jr. were eight years old at the time of the hearing. They had lived together with foster parent Iris for nearly two years. When the children were first placed with Iris, both exhibited signs of trauma. Frederick Jr. was terrified of any man, had nightmares, and would have outbursts. Faith was aggressive and extremely clingy. Both children were diagnosed with PTSD, and Frederick Jr. was diagnosed with ADHD, bipolar disorder, and intermittent explosive disorder. Both children have improved significantly

in Iris's care. They are working through their trauma with Joslin in therapy and learning coping skills. Both children were delayed in their education and have IEPs. Faith is in an integrated classroom but receives daily help in reading and writing, which has significantly improved. Frederick Jr. is working to learn to write the alphabet and recognize basic words. Iris has included them in family reunions, holidays, and family events. Iris testified that she would like to adopt the twins and wants to see how they grow up. Iris has agreed to continue visitation with the twins' siblings.

¶ 98    Contreras, the twins' caseworker, has seen positive changes with the twins. She observed a loving relationship between the twins and Iris. She recommended termination of parental rights to allow the children to be adopted and live in a stable and positive environment. Visits with Allinia were not recommended because Joslin did not think it would be clinically appropriate. Joslin testified that it was not in the children's best interest to have visitation because Allinia failed to take responsibility for the trauma Faith and Frederick Jr. have endured and the twins needed to feel safe.

¶ 99    Kelis has been with her foster family almost two years. Nancy testified that Kelis is part of their family, which includes two older biological sons. Kelis is bonded to the extended family as well. She was nearly two years old at the time of the hearing. She did not need any services with DCFS. Nancy agreed to maintain visitation with Kelis's siblings and would allow contact with her parents if it is safe for Kelis. Nancy would like to adopt Kelis into their family. Williams, Kelis's caseworker, observed the bond between Kelis and her foster family and recommended termination of parental rights to allow for adoption. She also stated that Allinia has not maintained her allowed visitation with Kelis.

¶ 100 We find the trial court properly weighed the best interest factors before terminating Allinia's parental rights. In making its best interest finding, the trial court noted Frederick Jr.'s injuries in Allinia's presence and observed that the children were "well cared for" in their foster homes and "doing much better." In reviewing the evidence presented in light of the best interest factors, we cannot say that the trial court's decision was against the manifest weight of the evidence.

¶ 101 Next, Allinia contends that the trial court's decision to proceed with an expedited termination of parental rights violated her constitutional rights because the unfitness finding was made prior to the disposition hearing and no aggravated circumstances existed in regard to her.

¶ 102 "Procedures involved in terminating parental rights must meet the requirements of the due process clause." *In re Julieanna M.*, 2018 IL App (1st) 172972, ¶ 14.

> "In determining what due process requires with respect to the termination of parental rights, a court must consider (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of the interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute safeguards would entail." *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976)).

Allinia has not challenged a deprivation of any of the *Mathews* elements in her due process challenge.

¶ 103 Recently, the First Division of this court observed, "as a matter of policy, the State should not routinely seek termination of a parent's rights at the time of the dispositional hearing, but

should, instead, expedite termination through a combined termination and dispositional hearing only in limited and 'aggravated' circumstances." *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 70.

¶ 104 As noted earlier, the Juvenile Court Act allows for an expedited termination determination at the initial disposition hearing "if all of the following conditions are met": (i) "the original or amended petition contains a request for termination of parental rights and appointment of a guardian with power to consent to adoption"; (ii) the abuse, neglect, or dependency of the minor has been found by a preponderance of the evidence; (iii) parental unfitness has been found by clear and convincing evidence; and (iv) "the court determines in accordance with the rules of evidence for dispositional proceedings" that (A) it is in the best interest of the minor and the public for the minor to be made a ward of the court, (B) reasonable reunification efforts are inappropriate or were unsuccessful, and (C) termination of parental rights is in the minor's best interest. 705 ILCS 405/2-21(5) (West 2016).

¶ 105 In this case, the trial court followed the statute and all the conditions to allow for an expedited termination proceeding were met in this case. The State filed amended petitions seeking a termination of parental rights on November 3, 2016. Following an adjudication hearing, the trial court found the minors were abused and neglected. Allinia did not challenge the finding of abuse and neglect for the minors on appeal. Next, the court found by clear and convincing evidence that Allinia was unfit due to depravity and an injurious environment. The court then conducted a dispositional hearing to consider the best interests of the minors. Following the hearing, the court found it was in each of the minors' best interest to be made wards of the court, reasonable efforts toward reunification were either inappropriate or unsuccessful, and it was in the best interest of the children to have their parental rights terminated.

¶ 106   Allinia has not argued that these conditions have not been met. Rather, she contends that the trial court improperly made an unfitness finding prior to the disposition hearing. However, Allinia cites no authority that such a finding was improper.

¶ 107   "Whenever such an expedited termination ruling is made, the evidence supporting a finding of unfitness is necessarily that evidence presented at the adjudicatory hearing." *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 82; see 705 ILCS 405/2-21(5)(iii) (West 2016) (permitting expedited termination if the court finds the parent unfit "on the basis of clear and convincing evidence admitted at the adjudicatory hearing").

> "In such situations, the circuit court must consider the same evidence under two different standards; it must decide whether a preponderance of the evidence supports a finding of abuse, neglect, or dependency (705 ILCS 405/1-3(1), 2-18 (West 2014)) and, following a dispositional finding, must review the same evidence again to determine whether the parent's unfitness is established by clear and convincing evidence (705 ILCS 405/2-29(4) (West 2014))." *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 82.

Further, the Juvenile Court Act "establishes a bifurcated procedure for the termination of parental rights pursuant to which a finding of unfitness is only the first step. A further finding that termination is in the minor's best interest must also be made before parental rights are legally terminated." *Id.* ¶ 84.

¶ 108   Allinia also contends that her equal protection rights were violated because there was no basis for the expedited termination proceedings against her. She also points to a comment in *dicta* by the trial court at the conclusion of the disposition hearing:

> "I will say this, having gone through this proceeding, I guess I would question the propriety for proceeding in this way rather than just proceeding as if

it were a 'normal' case. But, it's too late now for me to worry about that. So, maybe I'll think about that for future cases."

¶ 109  "The guarantee of equal protection requires that the government treat similarly situated individuals in a similar manner. Thus, the government may not accord different treatment to persons who have been placed by statute into different classes on the basis of criteria wholly unrelated to the purpose of legislation." *In re R.C.*, 195 Ill. 2d 291, 309 (2001). "However, the equal protection clause does not forbid the legislature from drawing proper distinctions in legislation among different categories of people." *Id.*

¶ 110  Here, the legislative intent to allow for expedited termination proceedings in aggravated cases is appropriate. As it pertains to this case, the trial court found that Frederick Jr. had been tortured by Kewon while his mother Allinia was present. Allinia did not intervene to stop the abuse, which left Frederick Jr. with a broken pelvis, but instead left Frederick Jr. and Faith at their father's residence and told Frederick Sr. the children were his responsibility. When contacted by DCFS investigator Cash, Allinia told her that Frederick Jr. was "a thief, a liar, he's manipulative, he turns over furniture at the school." Allinia denied Frederick Jr. had any injuries when she left him at his father's house. Further, the twins' therapist Joslin testified that Allinia continued to deny responsibility or knowledge of how Frederick Jr. was injured. Additionally, significant evidence was presented to establish a pattern of physical abuse to both of the twins with scars from being struck by a cord or belt. Allinia had previously been convicted of endangering the life of Faith in 2014. Given the overwhelming evidence presented, the circumstances of this case were aggravated and warranted an expedited proceeding. Further, the trial court's comments do not impact this conclusion; regardless of the court's thoughts in retrospect, the proceedings took two years, and after the hearings, the court concluded Allinia

was unfit and it was in the children's best interest to have their parental rights terminated. We find no constitutional violations in these proceedings.

¶ 111    Finally, Kewon asserts that his due process rights were violated because he was found to be depraved based on actions against Frederick Jr. when he was not a party to that case or the named perpetrator. Kewon argues that because he was not a party in Frederick Jr.'s case, he did not have the right to appointed counsel to be present at the hearing. He asks this court to reverse the finding of depravity because he was not the named perpetrator in Frederick Jr.'s case.

¶ 112    The State points out that Kewon failed to raise this constitutional claim in the trial court and, thus, it has been forfeited on appeal. The supreme court has held that the forfeiture principle applies to proceedings under the Juvenile Court Act when a party fails to raise an issue before the trial court before raising it on appeal for the first time. *In re M.W.*, 232 Ill. 2d 408, 430 (2009). Accordingly, this issue has been forfeited. Forfeiture aside, Kewon's due process argument lacks merit.

¶ 113    As we previously observed,

> "[i]n determining what due process requires with respect to the termination of parental rights, a court must consider (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of the interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute safeguards would entail." *In re Julieanna M.*, 2018 IL App (1st) 172972, ¶ 14 (citing *Mathews*, 424 U.S. at 334-35).

"Procedural due process requires notice and the opportunity to be heard." *In re J.B.*, 332 Ill. App. 3d 316, 320-21 (2002).

¶ 114   In *J.B.*, the respondent argued that he was denied due process when named as the perpetrator for the sexual abuse of the sibling of his child where he was not a party to the case. *Id.* at 320. The parties disputed whether the respondent was a party to the sibling's case. *Id.* The reviewing court did not need to determine whether the respondent was a party because, regardless of his status, he "was afforded all the procedural safeguards to which he would have been entitled if he were a party to the proceedings." *Id.* at 321. The respondent was given notice of the proceedings and the opportunity to be heard. He was present, represented by counsel, and allowed to cross-examine witnesses during the proceedings. *Id.*

¶ 115   Kewon relies on *In re A.M.*, 296 Ill. App. 3d 752, 757 (1998), to support his procedural due process argument. In that case, the parties stipulated that the minor had been sexually assaulted by her mother's paramour. *Id.* at 752. The trial court found the minor had been abused but refused to name the paramour as the perpetrator. *Id.* at 753-54. On appeal, the reviewing court affirmed, finding that the paramour was not a party and had no right to be heard. *Id.* The appellate court reasoned that if the trial court had named the paramour as the perpetrator, his procedural due process rights would have been violated. *Id.*

¶ 116   We find the facts of this case to be distinguishable from *A.M.* and more in line with the circumstances present in *J.B.* Here, Kewon was afforded both notice and the opportunity to be heard. While the cases for each of the minors, Faith, Frederick Jr., and Kelis, were docketed separately, the cases proceeded simultaneously throughout all proceedings. Kewon concedes that his attorney was present at all proceedings and was permitted to cross-examine all witnesses. Further, Kewon also admits that the naming of a specific perpetrator is not required by section 2-21(1) of the Juvenile Court Act. See 705 ILCS 405/2-21(1) (West 2016). Since he was afforded

both notice and the opportunity to fully participate in the proceedings as it related to the torture of Frederick Jr., we find that Kewon's due process rights were not violated.

¶ 117    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 118    Affirmed.