2024 IL App (1st) 230591-U

No. 1-23-0591

Order filed March 29, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| IN THE INTEREST OF M.C., III, a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | No. 21 JA 00733 |
| | ) | |
| v. | ) | Honorable |
| | ) | Demetrios Kottaras, |
| Erica C., | ) | Judge, Presiding. |
| | ) | |
| Respondent-Appellant.) | ) | |

PRESIDING JUSTICE ODEN JOHNSON delivered the judgment of the court.
Justices Hyman and Tailor concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The circuit court's dispositional order finding that respondent-mother was unable to care for, protect, train and discipline the minor was against the manifest weight of the evidence due to the lack of written factual findings in the order and inadequate factual findings made at the hearing.

¶ 2    Respondent-mother Erica (Erica) appeals from a dispositional order that adjudicated M.C, III a ward of the court.[1] On appeal, respondent contends that (1) the circuit court failed to comply with the requirements of 705 ILCS 405/2-27(1) (West 2022)) when it failed to provide a written factual basis for its finding and its oral ruling insufficiently explained its findings and (2) the circuit court finding that respondent was unable for some reason other than financial circumstances alone to care for, protect, train, or discipline the minor under 705 ILCS 405/2-27(1) (West 2022)) was against the manifest weight of the evidence. For the following reasons, we reverse.

¶ 3                                    I. BACKGROUND

¶ 4    The record reveals that on August 9, 2021, the State filed a petition for adjudication of wardship regarding M.C., III, a minor. The minor was born prematurely on June 18, 2021, and was released from the neonatal intensive care unit on July 6, 2021. The petition included the names and addresses of the minor's parents, Erica and Malcolm C., Jr. The petition alleged that the minor was not taken into custody, but that a temporary custody hearing was scheduled for August 11, 2021. The petition further alleged that the minor was neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2020)) because he was a minor under 18 years of age whose environment was injurious to his welfare. As factual support, the State alleged that:

        " There is an ongoing issue of domestic violence between the parents. On or about

        July 30, 2021[,] the mother was observed to have bruising on her body and a facial injury.

        Mother states that father caused the injuries observed during a physical altercation. This

_____

        [1] Erica is not appealing the adjudication finding of abuse and M.C., III's father is not a party to this appeal.

minor was present during that altercation. On or about July 30, 2021[,] this minor was diagnosed with a distal tibial fracture. Mother has no explanation as to how this minor was injured. Both parents are caretakers for this minor. Medical personnel state that this minor's injury was inflicted and due to abuse. Per mother, on or about July 28, 2021[,] father was arrested for driving around with a gun in his vehicle. The minor was present in the vehicle during this incident. There is an order of protection in place which prevents father from having any contact with this minor. Parents are married."

¶ 5    Additionally, the petition alleged that the minor was abused in that his parent or immediate family member inflicted, caused to be inflicted, or allowed to be inflicted upon him physical injury, by nonaccidental means which caused death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function under section 2-3(2)(i) of the Act (*id.* §2-3(2)(i)) and created a substantial risk of physical injury to the minor by other than accidental means, which would be likely to cause death, disfigurement, impairment of emotional health, or loss of impairment of any bodily function under section 2-3(2)(ii) of the Act (*id.* § 2-3(2)(ii)). As factual support for this allegation, the petition restated the prior factual allegations. The petition sought a declaration that the minor be adjudged a ward of the court. Parallel pleadings were filed against respondent-father.

¶ 6    The State also filed a motion for temporary custody of the minor on the same date. The pleadings included an affidavit of Pamela Gibson, dated August 3, 2021, that documented efforts of the Department of Children and Family Services (DCFS). She averred that the case was brought to DCFS attention because the respondent-parents had a history of domestic violence and most recently in the presence of the newborn minor on July 28, 2021. Dr. Jill Glick examined the minor

and x-rays indicated that the minor had an old healing ankle fracture and that the mother did not know how he was injured. Dr. Glick stated that a one-month-old baby does not have fractured ankles through birth or when the baby is born a preemie, and that the injury was abusive. Gibson further averred that the reasons she identified that led DCFS to place or consider placing the minor was due to the presence of domestic violence with respondent-father; mother filed a complaint on respondent-father on May 10, 2021, but refused to prosecute and the order was dropped. Erica filed another emergency order of protection on July 28, 2021, which was in the process of a court date by Zoom videoconference. Gibson concluded that under the circumstances, there was no effort that would prevent placement of the minor due to the parents' history of domestic violence and the risk of harm to the minor.

¶ 7    At the temporary custody hearing on August 11, 2021, the circuit court found that probable cause existed that the minor was abused/neglected/dependent based on the factual findings as alleged in the State's petition, and that immediate and urgent necessity existed to support removal of the minor from the home. The court also found that reasonable efforts had been made but had not eliminated the immediate and urgent necessity to remove the minor from the home. Temporary custody was granted to the DCFS Guardianship Administrator with the right to place the minor. A visitation order was entered for Erica for limited visitation at the discretion of DCFS because she needed assessment and to participate in recommended services for reunification. Erica C.'s visitation was limited to supervised day visits and was ordered to observe the following conditions: ensure appropriate supervision and provide all care during visits; cooperate and comply with all reasonable requests and referrals made by DCFS; notify DCFS of any change of address; notify DCFS of any change in living situation; not to use or allow others to use corporal punishment on

the minor; provide samples for random drug screens as requested; and ensure during visits that the minor had no contact with respondent-father. The record indicates that a guardian *ad litem* (GAL) was also appointed for the minor on the same date and the child was placed in foster care with a relative.

¶ 8 The record contains an integrated assessment that was filed with the circuit court on April 26, 2022, the same day that a joint case management/court family conference was held. As part of the assessment report, an individual assessment was generated for Erica C., who was interviewed by LaRabida Children's Hospital Clinical Screener, Elisabeth Davies. Erica reported that she was diagnosed with Stiff-Person Syndrome, which caused her to be unable to walk and experience multiple daily seizures, and she was prescribed medication for her condition. At the time of the interview, she was prescribed Methocarbamol, Baclofen, Levetiracetam, hemoglobin infusions, Benadryl and Tylenol as needed. She became pregnant with the minor six years after her diagnosis, which was rare, and had not experienced any seizures for two years. Erica was aware that DCFS became involved with the minor because of a fracture to his ankle and her inability to explain how or when it could have occurred. She stated that when she was told of the fracture, she "asked a million questions," and was informed that the injury was accidental, which was difficult to process because with the minor's premature birth, she took him to the pediatrician all the time. Erica stated that prior to the discovery of the minor's injury, he was in respondent-father's care on July 28, 2021, when he was arrested. She explained that due to the parties' separation, they had established a visitation plan with the minor's paternal grandfather as the mediator. Erica always dropped the minor off with his paternal grandfather and he always returned home with her on the same day at 5 p.m. On July 27, 2021, the minor was not returned home by 5 p.m. and she called

the police as the minor needed to be fed every two hours. Erica received a call from the police the following morning, stating that they had arrested respondent-father for possession of a weapon and she needed to pick the minor up. When Davies asked her if she was concerned that the minor may have been injured during his time with respondent-father, Erica reported that the minor was not fussy, she assumed that there would be a thorough check by the pediatrician at the scheduled appointment the next day.

¶ 9    Erica reported that she had been previously married for 11 years to her daughter's father (her daughter was born July 19, 2006). While she had primary custody of her daughter until she finished elementary school, her daughter chose to live with her father after that time and she had most recently seen her daughter for her birthday in July 2021.

¶ 10    Erica met respondent-father in 2019 and they were married in March 2020. She reported a history of domestic violence between them that began in 2019; she ended the relationship in November 2020 and discovered she was pregnant approximately three months later. Erica was unaware of respondent-father possessing marijuana and alcohol while driving with the minor and denied knowledge of any mental health concerns for respondent-father. She stated that the parties were in the process of a divorce due to domestic violence and that she had no contact with respondent-father. Erica also stated that while respondent-father was verbally and emotionally abusive to her, he was not physically abusive to her. Davies noted in the assessment that per respondent-father's interview, he believed that Erica C.'s ex-husband may have broken her legs and the family placed her daughter with the ex-husband while Erica was hospitalized. Per another interview, Davies noted that Erica C.'s daughter was placed with her ex-husband after Erica was injured during an incident of domestic violence with respondent-father. Erica told Davies that the

domestic violence with respondent-father did not begin immediately but began in 2019 with him raising his voice and becoming more controlling of her before he began shoving her or forcefully grabbing her arm. Erica reported that eventually she needed medical attention for broken bones, stitches and staples but could not recall exactly when the injuries took place. The most recent injury in September 2020 was a broken jaw that required staples. Respondent-father denied injuring Erica but he was subsequently served with an order of protection. Erica reported that respondent-father continued to harass her and she called the police about respondent-father 37 times while she was pregnant and changed her phone number three times. She denied that there was any domestic violence during the pregnancy, but the report noted that she was bruised and bloody at the minor's medical appointment on July 30, 2021.

¶ 11    Davies verified that an order of protection was entered against respondent-father on December 26, 2019, and expired January 16, 2020. Records showed a complaint filed against respondent-father in May 20201, but charges were not pressed. Erica petitioned for another order of protection against respondent-father after DCFS became involved but missed her court date and the order of protection petition was dismissed. Erica reported that she had received domestic violence advocacy services approximately 18 months and had a current order of protection against respondent-father.

¶ 12    Erica had also undergone a psychiatric evaluation during the pendency of the case and was diagnosed with depression and post-traumatic stress disorder (PTSD); she was seeing a therapist as part of her services and was prescribed Sertraline, Diazepam, and Mirtazapine. With respect to the minor's injury, Erica stated that she was aware that injury could not have been accidental and questioned how she could have missed it. She stated that while she knew it was a possibility that

respondent-father could injure the minor, she never witnessed him do anything to the minor or purposely hurt him.

¶ 13     Davies report made the following recommendations for services before the minor could be returned to Erica C.'s care based on why the case was initiated by DCFS: ongoing individual therapy to address the threat posed to the minor by domestic violence, her depression and PTSD and their effect on her parenting; a referral to DCFS consulting psychologist for a parenting capacity assessment; ongoing domestic violence services; a safety plan in the event Erica may need to relocate immediately as well as a co-parenting plan to ensure that she and minor remain safe; obtaining the minor's medical records; parenting education/coaching, preferably the Nurturing Parenting Program (NPP);

¶ 14     The parties' caseworker from Lutheran Child and Family Services (LCFS), Ashley Robinson, testified at the conference. She stated that she was assigned to the case in February 2022, and the minor was placed with a "fictive kin."[2] The minor's foster parent was Nancy Bobo, who assumed care of the minor in December 2021, and Robinson had visited the minor within the prior 30 days. The foster home was safe and appropriate and there were no signs of abuse, neglect or corporal punishment to the minor. Robinson did however testify that she had an unusual event to report. On April 20, 2022, during respondent-father's visit with the minor, Robinson noticed that he had a severe cough. The cough continued after the minor was returned to the foster home and the foster parent took him to the emergency room, where the minor was diagnosed with an upper respiratory infection. At the time of the conference, the minor was 10 months old, all of his

_____

[2] A fictive kin relationship is one that a child has with "'an individual who is not related by birth, adoption or marriage to a child, but who has an emotionally significant relationship with the child.'" Fictive Kin (americanbar.org), quoting American Legislative Exchange Council. The Kinship Care and Fictive Kin Reform Act, 2017.

medical exams were current and he was receiving weekly occupational therapy and physical therapy through Easter Seals. The minor was not in daycare and was bonded to the foster parent.

¶ 15    Robinson also testified that Erica was assessed for services and recommended to engage in individual therapy, domestic violence, a parenting capacity assessment, the Nurturing Parenting Program, and child psychotherapy. She further testified that Erica had been in individual therapy since November 2021 and was engaged in therapy; successfully completed her domestic violence victim services in December 2021, and completed the Nurturing Parent Program although her weekly visits with the minor were still being observed by a parenting coach. Erica had just been referred for a psychological evaluation week of the hearing and she had been on the wait list for child psychotherapy since March 2022. Robinson testified that Erica had weekly supervised visitation scheduled with the minor on Wednesdays but was not consistent in those visits and would arrive on Tuesdays due to work conflicts. Robinson also stated that the case aide observed that while there were no immediate concerns with Erica C.'s visits, the aide observed that Erica had difficulty holding the minor and difficulty holding the minor and the car seat at the same time. Robinson acknowledged Erica C.'s medical condition contributed to that and noted that Erica was nurturing to the minor and provided him with things she purchased for him during her visits.

¶ 16    On cross examination Robinson stated that the therapist reported no issues with Erica C.'s mental health and that, while Erica had weekly drug testing scheduled during her work hours, but had completed it. Erica C.'s attorney asked whether the testing could be scheduled so as not to interfere with Erica's work schedule or cause her to incur $30 weekly transportation costs to the testing location. Robinson also confirmed that Erica's Tuesday and Wednesday visits with the minor were scheduled during Erica's work hours, which resulted in her getting into trouble at

work. Robinson explained that some of the services recommended for Erica were part of the standard referrals based on the integrated assessment.

¶ 17 The adjudication hearing was held on June 7, 2022. Gibson testified that she was a DCFS investigator assigned to the family on July 30, 2021. She was asked to investigate the minor's fracture to his tibia. She met with Erica in person on August 2, 2021, and discussed the pending investigation. They also discussed the domestic violence incident between Erica and respondent-father, specifically that when Erica was on the way to take the minor to the doctor, respondent-father followed her and stopped her. When she pulled over, he assaulted her and she reported it when she arrived at the hospital. The minor was with Erica when this incident occurred. During their meeting, Erica showed Gibson a copy of an order of protection that she obtained against respondent-father.

¶ 18 During her investigation, Gibson also spoke with Dr. Jill Glick, an abuse specialist at Comer Children's Hospital, on August 2, 2021, about the minor's injury. After speaking with Dr. Glick, Gibson concluded that Erica's investigation was "indicated" rather than unfounded. On cross-examination, Gibson indicated that when she met with Erica, she observed that her apartment was safe and appropriate with items for the minor present. Gibson also stated that Erica relayed to her that the minor was with respondent-father on July 28, 2021, when respondent-father was arrested and believed him to be angry with her because she would not bail him out. Erica told Gibson that the minor had a prescheduled pediatrician appointment on July 30, 2021, to which she arrived with injuries.

¶ 19 Latosha Barnes testified that she was a child protection investigator with DCFS and was one of the investigators assigned to the minor's family on July 31, 2021. Barnes met with Erica in

person at Comer Children's Hospital to discuss the pending investigation. She discussed the minor's injury with Erica, who stated that she did not know how he got injured. Erica told Barnes that she and respondent-father were married but were separated, and also that she had a history of domestic violence and had previously obtained an order of protection against respondent-father. Barnes saw that Erica had a busted lip, some scratches to her neck and another injury that she could not recall during her testimony. Barnes stated that Erica was thin and was crying a lot while they talked. Erica told Barnes that respondent-father attacked her. Erica also told her that she allowed respondent-father to see the minor for a few hours and he did not bring the minor back on time, and respondent-father got angry because she called the police.

¶ 20     Barnes spoke with Erica a second time at the hospital the same afternoon with Detective Scott of the Chicago Police Department present, about her relationship with respondent-father. In that conversation, Erica reiterated the things she told Barnes earlier. On cross-examination, however, Barnes stated that Erica changed her story when respondent-father's parents were present, which caused Barnes to make a "critical decision" and alert her supervisor. Barnes noted that Erica's demeanor changed once respondent-father's parents were in the room. Barnes stated that after respondent-father's parents learned of the order of protection and the alleged domestic violence, they began to yell and stated that it was not true, which is when Erica changed her story.

¶ 21     Chicago police officer Thomas Williams testified that he was on patrol on July 27, 2021, and conducted a traffic stop of respondent-father. When Officer Williams approached respondent-father's car, he observed a passenger in the front seat and a baby in the back seat. The baby was not strapped in the child safety seat, nor was the seat properly buckled in the car. Officer Williams smelled cannabis coming from the vehicle and saw narcotics packaging on the front seat.

Respondent-father responded that it was just some weed. Officer Williams then asked all occupants to exit the car so he could conduct a narcotics investigation. Once the occupants were moved to the rear of the vehicle, Detective Deering searched the vehicle. Detective Deering found open alcohol, more cannabis in the car. When Detective Deering looked in the backseat where the child safety seat was on the rear passenger side, she recovered a loaded gun. After the search, respondent-father was detained.

¶ 22    The State published the minor's records from Comer which included a consultation by Dr. Glick on July 31, 2021. Dr. Glick indicated that she was called by her coordinator on July 30, 2021, because the mother arrived at the minor's appointment at LaRabida with bruises and the mother was directed to have the minor evaluated at Comer. While the minor had no visible injuries, the x-ray revealed that he had a healing older left tibial fracture. Dr. Glick reviewed the minor's NIC-U stay, noted that he was premature, born by C-section and that there was no issue with injury or infection. She indicated that the minor's injury was not a birth injury and the minor was clinically well for the three-plus weeks he was at Comer. Dr. Glick's diagnosis was child abuse and medical neglect, noting that the minor's injury was not a common one. Further, Dr. Glick indicated that there should have been care sought at the time of the injury because he would have been in pain and the injury would have been apparent.

¶ 23    At the conclusion of the hearing, the circuit court found that the minor's injuries supported findings of physical abuse and substantial risk of injury. The court noted that it could not identify who inflicted the injuries, but that the gun in the vehicle was inappropriate, the cannabis and alcohol with the minor unsecured in the car all supported findings on all grounds: neglectful environment, injurious environment, physical abuse, and substantial risk of injury. The circuit

court concluded that the State proved all of the allegations by a preponderance of the evidence. The disposition and permanency hearing was scheduled for December 22, 2022.

¶ 24    Robinson testified at the disposition hearing that the minor was in the third foster home because the agency learned that the prior foster parent was a non-relative and was unlicensed. The first foster home was with a relative of Erica's but Robinson was unsure why the minor was removed. Robinson had last visited the current foster home on December 15, 2022, and found the home safe and appropriate, and there were no signs of abuse, neglect or corporal punishment. The minor was engaged in occupational therapy and physical therapy prior to leaving his last placement, but the services were disrupted due to the change in foster care. Robinson also testified that Erica was being assessed for services, and the recommendations were individual therapy, domestic violence services, the nurturing parent program, a parenting capacity assessment, child/parent psychotherapy, a substance abuse assessment, and drug drops. While Erica was currently engaged in individual therapy, she had missed sessions after March 2022, attended some in August 2022 and October 2022 before her therapist left the agency. Erica was assigned to a new therapist and resumed therapy as of December 5, 2022. Robinson indicated that Erica was expected to address the minor's injury and the domestic violence in her therapy sessions. Erica completed her domestic violence program and a domestic violence safety plan was put in place. Robinson stated that Erica no longer needed domestic violence services but that it would be helpful for her to continue therapy regarding domestic violence. Erica also completed her parenting education services and had engaged in the parent coaching program, which she was to continue on an as needed basis. Erica failed to appear for some drug drops and had positive drop results from some of her prescription medications, namely benzodiazepine. Robinson testified that Erica has stiff

person syndrome, and that she was recommended for early intervention services. Robinson also testified to Erica's other missed appointments for services due to her work schedule, and further that Erica had supervised visits with the minor. There were some concerns at the visits; Erica arrived at one visit with an open bottle of alcohol, the case aide smelled liquor on her breath at another visit and was stumbling, and Erica attempted to order alcohol at a restaurant visit. Erica's visits were cut to one day per week due to her missing visitation; however, Erica no longer works at that job, so Robinson said there was no barrier to increasing her visitation with the minor beyond staffing. Robinson concluded her testimony with a recommendation that DCFS be appointed as the minor's guardian with the right to place him because both parents had outstanding services that need to be completed before a return home can be successful. With respect to Erica, Robinson stated that there were no barriers, only services that she needed to complete.

¶ 25    On cross-examination, Robinson acknowledged that Erica requested that visitation occur around her work schedule which would be after 5:00 p.m. or on the weekends, but stated that no one is available for weekend visitation. Robinson was unaware that Erica lost her previous job for attempting to comply with services and visitation during work hours, but indicated that she would need to speak with her supervisor about accommodating Erica's work schedule going forward. Erica had no visitation in the prior four weeks before the hearing because the minor was sick, the case aide having a family emergency for two weeks, and a miscommunication about where a visit was to occur. Robinson testified that the agency was unable to provide any other staff to supervise Erica's visits.

¶ 26    Erica testified that she had not seen the minor in the four weeks prior to the hearing and that it was the transponder who told her that the visits were cancelled and not the agency. She also

stated that she worked at a dental office six days per week and relayed her work schedule to the agency multiple times and asked if her visitation could be scheduled around her work schedule, but the agency was unwilling to make the accommodation. Erica stated that on a particular Tuesday she left work for her visitation during a time when the office was short staffed; when she returned, she was told that her personal issues- classes, drug drops, visits- were a huge conflict and she needed to get her things together before she could work there any longer. Due to her loss of employment and subsequent lack of income, Erica lost her apartment and was temporarily staying with friends. Erica responded that when she found a new job, it would be helpful if the agency could work around her work schedule and perhaps schedule the random drops during her visits to avoid excessive time off work. She also stated that an increase in visitation and unsupervised visitation would help her and the minor bond. Regarding the alcohol allegations, Erica stated that she did not attempt to order alcohol at a restaurant visit with the case aide, and she had a bottle of champagne at a visit that occurred after her office Christmas party where she was gifted the champagne and it was in one of her bags. She was not told that it was an issue until the next court date. Regarding the stumbling, Erica testified that she had stiff person syndrome, an auto-immune disease that would cause her to stumble, and that she was never informed by the agency of any issue regarding her stumbling. Her medical condition affects her coordination as well as carrying or lifting heavy things, but her medication allows her to manage her condition. Erica was prescribed benzodiazepine and diazepam as treatment for her condition. Erica also testified about the services she completed and about her accountability and understanding of the domestic violence circumstances in her life.

¶ 27 At the end of the hearing (which was continued to March 9, 2023), the circuit court made the minor a ward of the court, finding that Erica was unable for some reason other than financial circumstances alone to care for, protect, train or discipline the minor. The court noted that although it would have been nice to return the child home to one parent or the other, it did not think it was ready to do that yet. The court's order further indicated that reasonable efforts have been made to prevent or eliminate the need for removal of the minor from the home; appropriate services aimed at family preservation and family reunification were unsuccessful; and that it was in the best interest of the minor to be removed from the parent's custody. The order set the case for status on May 23, 2023.

¶ 28 The case them moved to the permanency hearing, where Robinson testified that the agency recommended a goal of return home in 12 months. On cross-examination, Robinson testified that Erica's current visitation was at the foster parent's home, who reported that Erica and the minor were engaged with one another and that Erica was good with him. Robinson visited Erica's new apartment and found it safe and appropriate. Robinson stated that the agency agreed with Erica having unsupervised day visits with the minor in her home. Robinson also acknowledged that the minor was removed from Erica's care when he was just a few weeks old.

¶ 29 The State and the GAL agreed with the recommended goal of return home within 12 months but not with Erica's unsupervised day visits. After hearing from all parties, the circuit court found that the appropriate permanency goal was return home in 12 months due to the outstanding services needed by both parents, as well as the in-progress services. The circuit court also expressed concern about how the agency had handled the case and asked that DCFS appoint a new

agency for the family. The circuit court also found that unsupervised visits for Erica were premature but would review it after a new agency was appointed.

¶ 30    Erica's timely notice of appeal was filed on March 30, 2023.

¶ 31                                II. ANALYSIS

¶ 32    On appeal, Erica contends that (1) the circuit court failed to comply with the requirements of 705 ILCS 405/2-27(1) (West 2022)) when it failed to provide a written factual basis for its finding and its oral ruling insufficiently explained its findings and (2) the circuit court finding that respondent was unable for some reason other than financial circumstances alone to care for, protect, train, or discipline the minor under 705 ILCS 405/2-27(1) (West 2022)) was against the manifest weight of the evidence. Both of these issues contest the findings made by the circuit court at the disposition hearing. Erica does not contest the findings made at the adjudication hearing.

¶ 33                             A. Jurisdiction

¶ 34    Whether this court has jurisdiction is reviewed *de novo*. *In re Ay.D.*, 2020 IL App (3d) 200056, ¶ 36. This case is before the court on an appeal from the dispositional hearing. We find that we do as the dispositional hearing is the final order from which an appeal properly lies. *Id.* ¶ 37. Appeals form final orders under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2020)) other than those involving the delinquency of minors, are governed by the rules applicable to civil cases. *Id.* (citing Ill. S. Ct. R. 660(b) (eff. Oct. 1, 2001)). To perfect an appeal in a civil case, a party must file a notice of appeal within 30 days after entry of a final order. Ill. S. Ct. R. 303(a) (eff. July 1, 2017)). Here, the circuit court entered the dispositional order on March 9, 2023, and Erica's notice of appeal was filed on March 30, 2023. Thus, we have jurisdiction.

¶ 35                             B. Timeliness

¶ 36 Before discussing the arguments respondent raises in this appeal, we address the timeliness of our decision. This is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). Pursuant to Rule 311(a)(5), we are required to issue our decision within 150 days after the filing of the notice of appeal, except for good cause shown. Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Erica C.'s notice of appeal was filed on March 30, 2023,  and as noted above, was initially consolidated with respondent-father's appeal, making the deadline August 28, 2023. Erica filed her appellant brief on June 29, 2023. The appeals were subsequently unconsolidated on the court's own motion on August 7, 2023. Both the Public Guardian and the State filed two motions for extension of time before ultimately filing their response briefs on October 19 and October 30, 2023, respectively. We cannot properly review a case and render our decision until we are fully briefed on the issues and the arguments of the parties. The case was made ready for disposition on November 9, 2023. We therefore find good cause for issuing our decision after the 150-day deadline. We now turn our attention to the merits of Erica C.'s issues on appeal.

¶ 37                                    C. Relevant Caselaw

¶ 38 Erica challenges the circuit court's dispositional findings that she was unable for other than financial reasons to parent the minor. Specifically, she contends that the circuit court failed to comply with the requirements of 705 ILCS 405/2-27(1) (West 2022)) when it failed to provide a written factual basis for its finding and its oral ruling insufficiently explained its findings, and further that the circuit court's findings were against the manifest weight of the evidence.

¶ 39 In any proceeding initiated pursuant to the Act, including an adjudication of wardship, the paramount consideration is the best interests of the child. *In re A.P.*, 2012 IL 113875, ¶ 18. The

Act prescribes the procedures that must be followed for determining whether a minor should be removed from his or her parents' custody and made a ward of the court. *Id.*

¶ 40      If the circuit court determines that the minor is abused, neglected, or dependent, then the matter proceeds to a dispositional hearing at which it determines whether it is consistent with the health, safety, and best interests of the minor and the public that the minor be made a ward of the court. 705 ILCS 405/2-21(2) (West 2020). The court must hold a dispositional hearing within six months of the minor's removal from the home. *Id.* § 2-22(4). At the dispositional hearing, the circuit court may commit the minor to wardship and place guardianship and custody with DCFS if the court determines that (1) the minor's parents are unfit or unable for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so and (2) the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents. *Id.* § 2-27(1). The paramount consideration is the best interests of the child. *In re B.S.*, 2022 IL App (2d) 220271, ¶ 31. Section 2-27's purpose is not to terminate parental rights but, rather, to decide what future actions are in the best interests of the child and whether to make the child a ward of the court. *Id*.

¶ 41      A reviewing court defers to the trial court's findings of fact because it is in the best position to observe the testimony of the witnesses, assess their credibility, and weigh the relative evidence. *Id.* ¶ 32. We will reverse the trial court's determination only if the factual findings are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order. *Id.* Under the manifest weight standard, an appellate court will affirm the trial court's ruling if there is any basis in the record to support the trial court's findings. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 24.

¶ 42     We agree with Erica's contention that the circuit court failed to comply with the Act by not providing a written basis to support its findings. Section 2-27(1) of the Act requires that the court put the factual basis for its finding that a parent is unfit or unable to care for, protect, train or discipline his or child in writing. 705 ILCS 405/2-277(1) (West 2020). Our supreme court has previously addressed this issue in *In re Madison H.*, 215 Ill. 2d 364 (2005). The court held that the writing requirement contained in section 2-27(1) existed to give the parties notice of the reasons forming the basis for the removal of the child and to preserve this reasoning for appellate review. *Id.* at 374. Explicit oral findings stated during a dispositional hearing advise the parties of the basis for the removal of the minor and once transcribed, provide an equal opportunity to review the validity of the findings on appeal as well as written findings contained in an order. *Id.* at 374-75.

¶ 43     In this case, the court indicated that it heard considerable evidence, attacks on the behavior and conduct of a prior caseworker, and that it would deal with each of those aspects individually. The court then stated that for purposes of disposition, that it was making the minor a ward of the court, appointed DCFS as the guardian, and found Erica to be unable only. Additionally, the record reveals that the dispositional order simply has a checked box indicating that Erica is unable to care for the minor. No other information is contained in the order. Neither the circuit court's statements nor the written order comply with the requirements section 2-27(1)  of the Act because no factual basis was given to support the court's determination.

¶ 44     Accordingly, we find that the circuit court's dispositional findings are against the manifest weight of the evidence. We therefore reverse the dispositional finding as to Erica and the minor shall be returned to her. Additionally, the circuit court shall order supportive services for Erica and the minor as appropriate or necessary.

¶ 45                    III. CONCLUSION

¶ 46    For the foregoing reasons, we reverse the circuit court's dispositional finding that respondent-mother was unable to take care of the minor and order granting guardianship and custody to DCFS, and remand for the return of the child to mother and further proceedings consistent with this disposition. Mandate to issue instanter.

¶ 47    Reversed and remanded with directions.