2024 IL App (1st) 232242-U

No. 1-23-2242

Order filed November 25, 2024.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| *In re* J.B. and H.D., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos.  18 JA 240 |
| | ) |     18 JA 242 |
| Ivelisse C., | ) | |
| | ) | The Honorable |
| Respondent-Appellant). | ) | Jennifer J. Payne, |
| | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Cobbs concurred in the judgment.

ORDER

¶ 1     *Held*: The State established by clear and convincing evidence that Ivelisse C. was unfit to parent her two children, and the State established by a preponderance of the evidence that it was in the children's best interests that Ivelisse's parental rights to them be terminated. The trial court did not violate Ivelisse's right to due process by prejudging her case. This court affirmed the decision of the circuit court.

¶ 2      Respondent, Ivelisse C., appeals from the circuit court's order terminating her parental rights to her minor children, J.B. (now age 10) and H.D. (now age 8), after finding Ivelisse unfit and that termination of her rights was in their best interests.[1] On appeal, Ivelisse contends the State failed to establish her unfitness and also that it was in her children's best interests that her parental rights be terminated. She maintains she's entitled to a new termination hearing because the trial judge advocated for the State, thus denying Ivelisse her due process right to an impartial factfinder. We affirm.

¶ 3                                      BACKGROUND

¶ 4      We recite only those facts needed for the disposition on appeal. The present case came to the attention of the Department of Children and Family Services (DCFS) on March 7, 2018, when Ivelisse and her paramour were involved in a domestic altercation in front J.B., who was then age three and a half, and H.D., who was then age one and a half. Police arrived to an apartment smelling strongly of cannabis, and Ivelisse was ultimately arrested for domestic battery while also being combative with the police and paramedics. The following day, the State filed a petition to adjudicate the children wards of the court and for their temporary custody, alleging the two children were neglected due to an injurious environment (705 ILCS 405/2-3(1)(b) (West 2018)) and abused due to substantial risk of physical injury (705 ILCS 405/2-3(2)(ii) (West 2018)). The State noted in the petition that Ivelisse already had a prior indicated report with DCFS for inadequate supervision, she was non-compliant with intact services, and diagnosed with bipolar disorder.[2]

---

[1]J.B. was born June 16, 2014, and H.D. was born August 26, 2016. Their natural fathers are not party to this appeal.

[2] "According to section 3 of the Abused and Neglected Child Reporting Act (325 ILCS 5/3 (West 2022)) " 'An indicated report' means a report made under this Act if an investigation determines that credible evidence of the alleged abuse or neglect exists." Alternatively, " 'An unfounded report' means

¶ 5    The court took temporary custody of the children and appointed the public guardian to represent the children and an attorney for Ivelisse, as well. Following that, on January 23, 2019, the court found the State had proven its allegations of abuse and neglect. In adjudicating the children abused and neglected, the court noted that, in addition to the children being present for the domestic battery for which Ivelisse was found guilty, J.B. and her older sibling (also named J.B. and who is not a party to this case) had reported Ivelisse committed excessive corporal punishment against them with cords and belts.[3] Ivelisse also was non-compliant with intact services (although the record indicates that intact case was later determined to be unfounded). The court granted the State's petition.

¶ 6    Following a dispositional and permanency hearing, in April 2019, the court adjudicated the children wards of the court, finding Ivelisse unable to care for them, and they were placed under DCFS guardianship with the permanency goal of return home within 12 months. The court noted that Ivelisse had made "some progress" and ordered services to be provided before reunification. It was determined that Ivelisse specifically needed services for domestic violence, anger management, individual therapy, substance abuse treatment, random urine drops, a psychiatric evaluation, and parenting coaching. DCFS subsequently placed all three children in the home of foster mother, Evelyn P., on December 5, 2019. Records from that time revealed Ivelisse was on track to regain her children, having engaged in some services, visited consistently, and made substantial progress. That, however, was not to last.

¶ 7    Notably, the State's evidence later revealed that Evelyn had met Ivelisse and her former boyfriend (the father of J.B.) when the two were shoplifting from a CVS that Evelyn managed.

_____

any report made under this Act for which it is determined after an investigation that no credible evidence of abuse or neglect exists." *Id.*

[3]The older sibling, J.B., was born July 31, 2013. Although her case was "on call" the same day as J.B. and H.D., the State elected not to proceed with a termination hearing relating to the older sibling, J.B.

Ivelisse subsequently recognized Evelyn when the two were, by happenstance, in the same restaurant in August 2018, and asked if she would take care of her children while she was subject to DCFS. With the children in her home, Evelyn immediately requested therapy for them because J.B. and Ivelisse's oldest child were "sexually active together." Ivelisse's oldest child eventually had to be moved to a different foster home based on this inappropriate sexual behavior.

¶ 8     In April 2021, the permanency goal changed to substitute care pending termination of parental rights, as it was determined that Ivelisse had not made substantial progress toward reunification. Going forward, the burden of identifying, obtaining, and paying for services was on Ivelisse. The State subsequently filed a petition to terminate Ivelisse's parental rights, alleging she was unfit for failure to maintain a reasonable degree of interest, concern, or responsibility as to her children's welfare (750 ILCS 50/1(D)(b) (West 2022)) and she failed to make reasonable efforts to correct the conditions that were the basis for the children's removal and/or failed to make reasonable progress toward the return of the children to her care for any nine-month period after the neglect/abuse adjudication (750 ILCS 50/1(D)(m) (West 2022). As to ground (m), the State listed five nine-month periods demonstrating a lack of substantial progress between September 24, 2019, and June 28, 2023.

¶ 9     An unfitness hearing ensued on October 23, 2023, wherein the State presented testimony from Virginia Towner, the supervising caseworker since 2018, Mariah Hobby, the current caseworker, and Evelyn, the foster mother. The State also entered a number of exhibits into evidence. The combined evidence revealed the following.

¶ 10     While Ivelisse participated in some DCFS services between 2018, the change in permanency in 2021, and the unfitness hearing in 2023, she did not fully complete the services or

put into practice the stated goals. For example, Ivelisse completed a parenting class in 2018 but never completed the requisite parenting coaching; per an April 2018 service plan, she had a mental health assessment but did not continue therapy, so she was rated unsatisfactory. In November 2018, Ivelisse was hospitalized with her follow-up family medicine records showing she was depressed, suicidal, exhausted, and strained, having previously been diagnosed with bipolar and anxiety disorders. She was diagnosed with post-traumatic stress disorder, too. While prescribed various medications by the family medicine provider, Ivelisse did not take them consistently. Rather, she smoked marijuana daily for symptom relief (having a 15-year history of abusing cannabis), even though it was thought to be an addiction contributing to her mental health problems. Although she participated in some mental health and substance abuse services in 2018 and 2019, she continued to test positive for cannabis and over several years her substance abuse recovery commitment was rated only as "moderate." She ultimately informed officials that she would not stop smoking marijuana.

¶ 11    Likewise, although Ivelisse completed an anger management class in May 2019, she continued to exhibit anger issues when visiting her children with the agency present. During one 2019 visit, the parenting coach approached Towner, reporting she feared Ivelisse. Towner then entered the room to find the children crying and Ivelisse yelling and using extreme profanity. She threw her cell phone, Towner recalled, and people in the office felt nervous. Visits were thereafter suspended for some three months and, again in 2020, because of Ivelisse's angry outburst, which agency officials could hear through the walls. For the second time, Ivelisse was asked to leave or the police would be called. She also was banned from the agency office.

¶ 12    Consistent with this testimony, a DCFS service plan from late September 2020 revealed that although Ivelisse was participating in services, she continued to exhibit anger and

inappropriate behaviors in front of her children. She was rated unsatisfactory for lack of compliance with a psychiatric evaluation, parenting coaching, and random urine drops for drugs. Interventions were ordered continued.

¶ 13    Similarly, the foster mother, Evelyn, testified that she refused to continue supervising Ivelisse's visits with the children in October 2020. This was because, at that time, Ivelisse called Evelyn and told her that she was going to burn down Evelyn's house, car, and then kill herself and her own children because Ivelisse did not want to live by Evelyn's rules. Evelyn wrote an email to DCFS memorializing the conversation, which was also overheard by Evelyn's coworker.

¶ 14    Leading up to this incident, Ivelisse was less than a model visitor. Many times, Ivelisse came to the home unannounced, sometimes as late as 10 p.m. On occasion, she acted "abnormally" and entered the home "under the influence" of substances. At J.B.'s June 2020 birthday party, Ivelisse smoked marijuana with her friends on the side of the house. The same year, Ivelisse screamed at Evelyn during a visit with the children when Evelyn suggested Ivelisse take care of the children. Ivelisse stated she "wasn't built for this" and demanded help. Ivelisse had frequent telephone and video calls with the children, but Evelyn ended one call early because J.B. asked Evelyn what "cunt" meant, reporting that her mother had called her that. During another call, Ivelisse told the children they would never see Evelyn once they returned home. As of October 2020, Ivelisse had also become increasingly disrespectful during visits.

¶ 15    In 2021, after participating in domestic violence, therapy, anger management, and parent coaching services for some two years, Ivelisse was discharged as unsuccessful for failure to make progress, and visits with the children were suspended again. Throughout the life of the case, Ivelisse did not have consistent housing and was at one point at risk of being evicted.

Ivelisse repeatedly refused recommended psychiatric exams (although she ultimately obtained one some six months before the October 2023 termination hearing).

¶ 16    Following the permanency goal change in April 2021, Ivelisse's overall lack of compliance with services, including anger management and proper parenting, continued. According to a September 2022 service plan, Ivelisse had "reported that she refuses to complete anger management classes," although she was participating in individual therapy. A March 2022 service plan revealed she had not obtained a psychiatric evaluation, as required. In April 2022, Ivelisse was discharged from an anger management program for failure to complete it. Ivelisse had unpredictable angry outbursts affecting the children's safety, and visits were again suspended in 2022 and October 2023, the same month as the unfitness hearing.

¶ 17    In particular, on October, 9, 2023, Ivelisse visited her children in the presence of a case aid at a local McDonald's. Ivelisse began inquiring about the foster home and this pending case, asking the girls who they wanted to live with (her or, Evelyn, the foster mother). When the case aide attempted to redirect Ivelisse, she apparently became angrier and angrier, and escalated. According to J.B.'s report, Ivelisse was "screaming at the top of her lungs." The case aide, feeling fearful, took the children to the car and waited there. The supervising caseworker, Hobby, later interviewed the children separately. They did not know what to expect when Ivelisse lashed out in this manner. H.D. informed Hobby that the incident scared her, and both children reported being embarrassed. J.B. reported she believed her mother was trying to coerce J.B. into saying she wished to stay with Ivelisse in front of the caseworker. Evelyn, who picked up the girls following the McDonald's incident, corroborated Hobby's testimony about the incident as reported by the children. After the visit when they got into the car with Evelyn, J.B. was crying and H.D. appeared very sad.

¶ 18    A parenting assessment, conducted in July and dated August 7, 2023, concluded that Ivelisse's significant mental health problems (including her depression, anxiety, posttraumatic stress disorder, and borderline personality traits) risked poor judgment, decision-making, and negatively impacted her ability to parent. She self-reported monthly panic attacks, meltdowns, and daily depression causing her to enter a "zombie" state, thus impacting her energy. Given her emotional state, practitioners concluded Ivelisse could have problems applying any parenting knowledge she gained. Ivelisse, for example, did not understand how her angry outbursts affected others, including her children. She still did not have stable housing or consistent employment. At the time of the assessment, she was living in a hotel on Chicago's southwest side. Notably, Ivelisse complained that DCFS had not helped her obtain a home or given her money for transportation. Ivelisse's continued daily use of cannabis also posed a risk.

¶ 19    According to the assessors, Ivelisse's elevated score on a "Child Abuse Potential Inventory" was consistent with parents who abuse their children; her "reported attitudes and characteristics" were "similar to those of known child abusers." Her minimization of her direct involvement in the removal of her children increased the risk of reoccurring abuse. Similarly, Ivelisse's "volatile affectivity and anger flareups" could "increase the likelihood of impulsive or possibly abusive behavior." These factors compromised the children's need for stability, security, and predictability. Notably, the children had their own mental health issues requiring therapeutic and possible psychiatric care.

¶ 20    Accordingly, the assessment recommended only supervised visits, notwithstanding that Ivelisse and her children had a "playful interactive style with one another." The assessment was based on a records review of DCFS documents in the case, Ivelisse's therapist and nurse notes, interviews with Hobby and Evelyn, and an interview with Ivelisse. The examiner also observed

Ivelisse and her children in unstructured time for about an hour. The assessment was signed by a licensed clinical social worker with a masters, a team coordinator, a licensed psychologist and a board certified psychiatrist.

¶ 21    Consistent with that assessment, Towner, the supervising caseworker who had observed Ivelisse's visits with the children numerous times, testified that she still had concerns about Ivelisse's anger as it related to her ability to safely parent J.B. and H.D. Towner explained that the children entered the court system in 2018 because of Ivelisse's inability to control her anger, which persisted. Since March 2018, the agency had not recommended unsupervised visits. This was notwithstanding that Ivelisse consistently visited the children, bringing them food and gifts, and they were happy to see her. As of the termination hearing, outstanding services included anger management, individual therapy, and substance abuse treatment, and Hobby testified that since she became the caseworker in March of 2023, Ivelisse had not completed any services. The court took judicial notice of the prior aforementioned orders entered preceding the termination hearing.

¶ 22    Following this evidence, the State and Public Guardian rested. Ivelisse then testified on her own behalf, in addition to presenting the testimony of her therapist, Celina Cantu. Ivelisse testified she completed a domestic violence and parenting course in 2022 and completed two anger management classes in 2019 and 2023. Certificates entered into evidence reflected the 2019 and 2022 services. Ivelisse denied shoplifting, smoking marijuana in front of her children, calling J.B. an inappropriate name, or threatening to burn down Evelyn's home and to kill herself or her children. Rather, Ivelisse visited her children any time she could and would bring them gifts or food. They would run to her and called her mom. They were bonded. She did not have a clear idea why she was banned from the agency. Ivelisse asserted that during the McDonald's

visit in October 2023, the case aide was trying to antagonize her, and Ivelisse denied yelling or arguing with the case aide. Also, Ivelisse only inquired about the case at visits because authorities at the agency were otherwise largely unavailable.

¶ 23    Cantu, a licensed clinical social worker, testified that she began seeing Ivelisse every two weeks in December 2022, to aid Ivelisse with coping skills, emotional regulation, and processing of feelings. The therapy, which did not include anger management, involved behavioral work to assist Ivelisse in regaining custody of her children. Cantu testified that Ivelisse had made substantial progress in therapy and was consistent in attending and appropriate. Cantu, however, had not reviewed the integrated parenting assessment. As to the McDonald's incident, Ivelisse told Cantu only that the visit was inappropriate and that Ivelisse's visits were thereafter suspended, but Cantu did not know further details, such as that Ivelisse screamed loudly inside the restaurant, ending the visit, or that he children were crying, frightened, and embarrassed. Cantu was similarly unaware of Ivelisse's threat to Evelyn's home, herself and the children, or that Ivelisse's visits were suspended multiple times due to her aggressive behavior in front of the children. With this testimony, Ivelisse rested.

¶ 24    Following arguments, the trial court found the State proved by clear and convincing evidence that Ivelisse was unfit. As to ground (m) — Ivelisse's failure to make reasonable progress toward the return of her children during any 9-month period after an abuse or a neglect adjudication — the court noted that this case started as intact, meaning Ivelisse was already subject to DCFS services when, in March 2018, she battered her paramour in front of the children and was arrested. At the January 2019 adjudication, the court found Ivelisse whipped her children with cords and belts. The court noted that in spite of making some efforts in the case, Ivelisse had continued explosive and aggressive episodes before the children, leading to the

repeated suspension of visits, visits ending early, and causing the children to cry. In particular, the court found Towner's testimony "very credible" that during one visit, Towner could hear Ivelisse shouting and swearing through the wall, leading to the visit's cessation. On the other hand, Ivelisse's claim that she had no clear idea why her visits were suspended was incredible, especially given Ivelisse's high level of engagement in the case. Moreover, the court found Evelyn's testimony credible, specifically as to the threats Ivelisse made, and denied that Evelyn participated in parental alienation, as argued by Ivelisse. The court noted that Evelyn and Hobby testified credibly and consistently regarding the October 2023 McDonald's incident, and thus found that Ivelisse (who denied yelling) was incredible. Further, according the parenting assessment, Ivelisse's mental health problems made her unable to parent and she had only achieved supervised visits after the case had been in the system for four years. The court acknowledged that Ivelisse made efforts early in the case and later, but determined that for the stated reasons, she "never made reasonable progress ever."

¶ 25    As to ground (b) — Ivelisse's failure to maintain a reasonable degree of interest, concern or responsibility as to the children's welfare — the court noted that although Ivelisse showed concern and interest in her children, she had not taken the "responsibility" needed to parent them. Ivelisse had refused to engage in services or obtain a psychiatric evaluation, and this was while another person was raising Ivelisse's own children. The court found Ivelisse's witness Cantu was unaware of the many incidents in this case and did not have the integrated assessment. Therefore Ivelisse had not been sufficiently honest or candid about the issues, which precluded meaningful progress. The court found that "[s]howing up once a week or once a month with a snack" was "not the type of responsibility that would rise to the level of parenting."

Accordingly, the court found the State had proved Ivelisse's unfitness by clear and convincing evidence.

¶ 26     The cause then proceeded to the best interests hearing, wherein the court took judicial notice of the evidence at the fitness hearing. Hobby and Evelyn testified that the children were safely and appropriately placed in Evelyn's home, where she provided them with all necessities and services, including medical and therapy, and they appeared well groomed and cared for.

¶ 27     Evelyn specifically testified that she would ensure that the children continue to receive necessary services. The children were well-situated in their schools and well-bonded with Evelyn, her biological son, their foster sister, and extended family. Evelyn testified the two girls were like family, not foster children, and they were affectionate and loving. She described their bond as "very strong." They did things as a family, such as attend movies, water parks, and eat out. In addition, the two girls were bonded to one another, as well as an older sister who used to live with them. Evelyn ensured the siblings saw each other and would continue to do so. Should the girls struggle with separation from Ivelisse, Evelyn would obtain appropriate services for them. Evelyn wished to adopt J.B. and H.D. because they had been with her for "forever" and she wanted to provide them a better home. If the children wanted to visit their mother, she would place their interests ahead of hers.

¶ 28     Consistent with Evelyn, Hobby testified that Evelyn and the girls were bonded with Evelyn and appeared to be a real family unit. Evelyn was committed to adopting both girls. The children reported feeling safe, comfortable, well-cared for, and stated that they loved living with Evelyn. They voiced no concerns.

¶ 29     Hobby spoke with each child in person and privately on October 10, 2023. J.B. told Hobby she wanted to stay with Evelyn but would be open to visiting her mother. She reported

being scared of Ivelisse during visits and was embarrassed by her. H.D. told Hobby that she wished to live with Ivelisse (prior to that, she had always said Evelyn). However, Hobby noted this interview occurred one day after the McDonald's incident, and when asked for more specifics, H.D. could not articulate why she wanted to live with Ivelisse except that she hadn't done so since she "was a baby." Hobby had since had conversations with H.D., wherein H.D. reported feeling sorry for Ivelisse because none of her other siblings wanted to return to her. H.D. stated that if return home were not an option, she would rather live with Evelyn and have visits with Ivelisse. She wished to continue living with J.B.

¶ 30     Hobby testified that it was in the children's best interests to have Ivelisse's parental rights terminated, citing Ivelisse's inappropriate behavior during visits, and that the children were fearful of and intimidated by her. In October, J.B. reported being pinched under the table by Ivelisse during a recent visit. Hobby testified that visits with Ivelisse after adoption could continue provided she was appropriate.

¶ 31     Following this testimony, the State and Public Guardian rested. Ivelisse then testified on her own behalf that she was strongly bonded with her children, who still called her mom. She did not feel it was in the children's best interests that her rights be terminated. Ivelisse, however, mainly testified about her oldest daughter, who was not subject to the petition.

¶ 32     Based on Evelyn and Hobby's testimony, the court found it was in the children's best interests to terminate Ivelisse's rights to them. Accordingly, the court entered an order to that effect, appointing a guardian with the right to consent to adoption of the minors. This appeal followed.

¶ 33                               ANALYSIS

¶ 34    Although parents have a fundamental due process right to the care, custody and control of their children, that right is subject to termination. *In re M.H.,* 196 Ill. 2d 356, 362-63 (2001). The involuntary termination of parental rights involves a two-step process, wherein the State must first prove by clear and convincing evidence that the parent is "unfit," and if found unfit, the court must next consider whether it's in the child's best interests to terminate parental rights. 750 ILCS 50/1(D) (West 2022)); *In re J.B.*, 2014 IL App (1st) 140773, ¶ 49. If a single alleged ground for unfitness is proven, a parent's rights may be terminated, and this obviates the need to consider other unfitness grounds. *Id.*; *In re M.J.,* 314 Ill. App. 3d 649, 655 (2000). At the best interests stage, the State must prove by a preponderance of the evidence that termination is in the child's best interests. *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 35    We will not disturb an unfitness or best interests finding unless it's contrary to the manifest weight of the evidence and the record clearly demonstrates that the opposite result was proper. *J.B.*, 2014 IL App (1st) 140773, ¶ 49; *T.A.*, 359 Ill. App. 3d at 961. Because child custody cases like the present are delicate and difficult, wide discretion resides in the juvenile court to an even greater degree than normal. *In re M.W.*, 2019 IL App (1st) 191002, ¶ 50. We thus defer to the trial court's factual findings and credibility assessments, and we will not reweigh the evidence anew on appeal. *J.B.*, 2014 IL App (1st) 140773, ¶ 49.

¶ 36    Ivelisse first challenges the trial court's unfitness findings (see 750 ILCS 50/1(D)(b), (m)(West 2022)). Each case concerning parental unfitness is *sui generis*, requiring a close analysis of individual facts, which means factual comparisons to other cases are of little value. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 47. To uphold an unfitness finding, only one of the statutory grounds set forth in section 1(D) of the Adoption Act is required. *Id.* Here, we have two grounds.

¶ 37 Section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1 (West 2022)) defines an unfit person as a parent who fails to make "reasonable progress toward the return of the child" during any nine-month period following an abuse or a neglect adjudication.[4] Services completed outside the identified time frame are irrelevant for measuring reasonable progress. *In re J.L.*, 236 Ill. 2d 329, 341 (2010); *Je. A.*, 2019 IL App (1st) 190467, ¶ 72. The benchmark for measuring this progress, which is an objective standard, "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001); *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 50-51. Reasonable progress includes "substantially" fulfilling the terms of a service plan, created to correct the conditions leading to the child's removal. *C.N.*, 196 Ill. 2d at 217. Similarly, reasonable progress includes a parent's demonstrable and quality compliance with directives given for the return of the child. *Ta. T.*, 2021 IL App (4th) 200658, ¶¶ 51, 55. "Ultimately, the trial court's ability to return the children to a parent's care *in the near future* is the lodestar of whether a parent has made reasonable progress." (Emphasis added.) *Id.* ¶ 55.

---

[4]Ivelisse argues that the statute requires the State to prove unfitness during *all* nine-month periods identified in the State's petition. This reading is contrary to the plain language of the statute, evincing the legislature's intent, which states that unfitness may be established during "any" nine-month period. See *In re D.F.*, 208 Ill. 2d 223, 229, 237 (2003) (also discussing the legislative history); *In re J.W.*, 2024 IL App (1st) 231918, ¶¶ 33-34. Even crediting her argument, Ivelisse has not established that the court's finding of unfitness over the nine-month periods identified by the State (between September 2019 and June 2023) was against the manifest weight.

In addition, we note that another basis for finding a parent unfit under section 1(D)(m)(i) is when a parent fails "to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period" after the neglect or abuse adjudication. 750 ILCS 50/1(D)(m)(i) (West 2022). This statutory ground was not at issue in the court's unfitness determination, so we need not address Ivelisse's lengthy argument regarding efforts for her children. We agree with the trial court that Ivelisse made efforts, insofar as she consistently visited her children when not suspended, she brought them gifts and food, and they were bonded.

¶ 38    This case came to DCFS's attention due to Ivelisse's battery of her romantic partner before her children, for which she was found guilty. The juvenile court also noted Ivelisse had committed excessive corporal punishment with cords and belts against J.B. and the oldest child.[5] Ivelisse did not contest that finding within 30 days of the dispositional order, thus waiving any challenge to it. See *In re Jaron Z.*, 348 Ill. App. 3d 239, 253 (2004) (noting, a dispositional order is final order from which an appeal properly lies, and a parent's failure to file a notice of appeal therefrom fails to perfect review of that order or of the neglect proceedings). Accordingly, DFCS identified a number of services for Ivelisse to engage in over nine-month periods spanning late September 2019 to late June 2023, in order to regain custody of her children. These services included domestic violence, anger management, individual therapy, substance abuse treatment, random urine drops, a psychiatric evaluation, and parenting coaching. While she took some classes, witness testimony, documents, and the service plans revealed she did not substantially or consistently complete the required services.

¶ 39    More importantly, evidence showed she was unable to successfully apply what she learned from the classes to interactions with her children such that they could be returned home safely. See *Ta. T.*, 2021 IL App (4th) 200658, ¶ 56. Due to Ivelisse's continued explosive and aggressive behavior during visits with J.B. and H.D., which scared the children and caseworkers and left the children in tears, Ivelisse's visits were suspended at least four times for months during the relevant time frame. DCFS never recommended unsupervised time with her children. Evelyn, the foster parent, in fact, had to discontinue overseeing Ivelisse's visits in 2020 based on

---

[5]The trial court took judicial notice of the dispositional and neglect/abuse orders, among others, at the unfitness hearing. On appeal, Ivelisse argues the burden of proof was less at the neglect/abuse hearing and therefore challenges the finding on that basis. Apart from the fact that she never objected to the court taking judicial notice of the adjudicatory order at the unfitness hearing, on appeal, she does not actually disavow the actual finding that she used cords and belts to beat her two older children. Her claim therefore has no merit.

Ivelisse's threats that she would burn down Evelyn's home and kill herself and her children. Towner, the supervising caseworker, testified that the case entered the system because Ivelisse could not control her anger, and she was still unable to control it at the conclusion of the identified nine-month period in June 2023. Ivelisse never properly completed the anger management services, and only obtained a psychiatric assessment around June of 2023. In addition, Ivelisse did not have consistent housing or employment. Contrary to Ivelisse's contention on appeal, the parenting assessment that retrospectively reviewed the case determined that her mental health struggles made parenting anytime in the near future essentially impossible. See *Ta. T.*, 2021 IL App (4th) 200658, ¶¶ 51, 55. It also concluded she was at risk to abuse her children. Thus, it's a reasonable inference, given her history, that Ivelisse's anger outbursts could translate to physical abuse and compromise the children's security.

¶ 40   Here, the court found the State's witnesses more credible than Ivelisse. The court noted that while Ivelisse had made some progress, Ivelisse was not forthcoming with Cantu in therapy and her testimony denying threats or downplaying her bad behavior was incredible. The court zeroed in on the fact that Ivelisse "never made reasonable progress ever" while the case lingered in the system for four years. Thus, to the extent Ivelisse engaged in services, her progress was simply too little too late. Based on the aforementioned testimonial and documentary evidence, in light of the objective statutory standard, we cannot say the court's determination was against the manifest weight of the evidence. Rather, the evidence overwhelmingly supports the unfitness finding. In so holding, we defer to the court's credibility findings and the weight it accorded the evidence. See *J.B.*, 2014 IL App (1st) 140773, ¶ 49; *T.A.*, 359 Ill. App. 3d at 961; *M.W.*, 2019 IL App (1st) 191002, ¶ 50.

¶ 41 We thus reject Ivelisse's arguments that DCFS somehow thwarted her progress by changing the goals or that her anger was directed at, and thus affected, the agency workers rather than her children, which she claims cannot be a basis for finding her unfit. The first argument lacks record support, and the second is simply disingenuous. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). As stated, Ivelisse's angry outbursts on several occasions left her children scared and in tears. Moreover, given that DCFS had identified the services needed and was required to supervise Ivelisse's visits with her children, Ivelisse's ability to interact with and take directives from caseworkers was naturally a reasonable part of the service plan and progress needed for regaining her children. See *C.N.*, 196 Ill. 2d at 216-17; *Ta. T.*, 2021 IL App (4th) 200658, ¶ 50-51.

¶ 42 For the same reasons, we conclude the court's determination that Ivelisse failed to maintain a reasonable degree of responsibility as to her children's welfare under ground (b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2022)) was not against the manifest weight of the evidence. See *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24. A ground (b) finding warrants a subjective analysis focused on the reasonableness of a parent's efforts while taking into account their difficulties and circumstances. *Id*. Simply because a parent exhibits some interest or affection towards her children is not sufficient to support a finding of fitness; rather, her interest, concern, and *responsibility* must be reasonable. *In re M.I. v. J.B.*, 2016 IL 120232, ¶ 30; *Je. A.*, 2019 IL App (1st) 190467, ¶ 50. Unlike ground (m), there is no time limitation. *Je. A.*, 2019 IL App (1st) 190467, ¶ 50. Here, Ivelisse's lack of substantial compliance with the service plans over four years, her angry outbursts, and inconsistent visits due to repeated suspensions supported the unfitness finding under ground (b). See *Je. A.*, 2019 IL App (1st) 190467, ¶ 53; *Nicholas C.*, 2017 IL App (1st) 162101, ¶¶ 29-31. We find it especially troubling that Ivelisse

still was unable to control her anger or work with DCFS during the visit with her children at McDonald's on October 9, 2023, just two weeks before the termination hearing. As the trial court found, Cantu's testimony revealed Ivelisse did not take responsibility for that incident or her role in the termination proceedings, which was unreasonable. In addition, Ivelisse's mental health problems and lack of stability did not provide a valid excuse for her failure to obtain psychiatric services in a timely manner. See *M.I. v. J.B.*, 2016 IL 120232, ¶ 30-31.

¶ 43 Ivelisse next challenges the best interests determination, contending the State failed to prove by a preponderance of the evidence that termination was in her children's best interests. For the reasons to follow, we disagree.

¶ 44 After an unfitness finding, the trial court focuses on the needs of the child in determining whether the parental rights should be terminated. *In re Faith S.*, 2019 IL App (1st) 182290, ¶ 93. At this stage, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life; a child's best interest is superior to all other factors. *Id*. To that end, section 1-3 of the Juvenile Court Act of 1987 (705 ILCS 405/1-3(4.05) (West 2022)) identifies a number of factors that must be considered, none of which is dispositive. *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 48. These include the physical safety and welfare of the child (food, shelter, health, and clothing), the development of the child's identity, the child's background and ties, sense of attachments (like where the child feels love, security, familiarity, continuity, and what's the least disruptive placement), the child's wishes and long-term goals, community ties (school, church, friends), need for permanence, unique circumstances, risks with being in substitute care, and preferences of those available to care for the child. *Id*.

¶ 45 Here, these factors compel termination. While Ivelisse clearly was bonded to her children and could care for them in the most superficial of manners, by visiting and bringing gifts and

food, the juvenile court was entitled to weigh more heavily the facts that the children were well-cared for and thriving in a loving foster home, where they had lived for four years. See *In re M.W.*, 2019 IL App (1st) 191002, ¶ 63; see also *In re Angela D.*, 2012 IL App (1st) 112887, ¶¶ 39-40 (noting, a bond with the natural parent, alone, does not compel a conclusion that termination was against the manifest weight of the evidence). There, they felt love, security, and a strong sense of attachment with community ties. Given that they themselves had psychiatric challenges and a foster mother willing to fully address those matters while also adopting them, remaining in that home was the least disruptive option. See 705 ILCS 405/1-3(4.05)(d) (West 2022); *S.K.B.*, 2015 IL App (1st) 151249, ¶ 48 (noting, an important consideration includes the nature and length of the child's relationship with the current caretaker and how a change of placement would impact the child's emotional and psychological well-being). Hobby testified that it was in the children's best interests to have Ivelisse's parental rights terminated.

¶ 46     Thus, there was no error in the court's determination that Ivelisse's interest in her children had to yield to their best interests in stability and continuity, the main goal of the statute. See 705 ILCS 405/1-2 (West 2022); *Angela D.*, 2012 IL App (1st) 112887, ¶¶ 39-40, and cases cited therein; *Cf. In re M.F.*, 326 Ill. App. 3d 1110, 1118 (2002) (finding termination of parental rights was not in the child's best interests where the child would not have gained any more stability from it). Accordingly, the court's determination that it was in the J.B. and H.D.'s best interest to terminate Ivelisse's parental rights was not against the manifest weight of the evidence.

¶ 47     Ivelisse argues to the contrary and claims Evelyn's testimony indicated she would not allow contact between Ivelisse and her children, thus harming their sense of attachment. However, Ivelisse fails to support her claim with any legal authority demonstrating that an

adoptive parent must maintain contact with the natural parent. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Second, Evelyn clearly testified that, provided adoption occurred, she would allow continued contact between Ivelisse and her children if they requested it, and if such contact was in their best interests. Presumably, this meant Ivelisse would be prohibited from threatening to burn down Evelyn's home, to kill the children, or from calling her children inappropriate things like "cunt." Likewise, Evelyn testified that if the children struggled with any separation from Ivelisse, she would obtain services for them. That, to us, seems entirely reasonable and in the children's best interests. See *Angela D.*, 2012 IL App (1st) 112887, ¶ 40.

¶ 48    Last, Ivelisse maintains she's entitled to a new termination hearing because the trial judge advocated for the State, thus denying Ivelisse her due process right to an impartial factfinder. In particular, Ivelisse argues the court's questioning of witnesses revealed it had adjudged Ivelisse unfit and her interests in her children terminated before all evidence had been submitted. For the reasons to follow, we disagree.

¶ 48    The determination of whether the court's questioning of a witness is appropriate depends on the facts and circumstances of each case and is largely left to the court's discretion. *In re Zoey L.*, 2021 IL App (1st) 210063, ¶ 36; *In re Maher*, 314 Ill. App. 3d 1088, 1097 (2000). A court abuses its discretion when it adopts the role of advocate for one of the parties and prejudices the opposing party. *Zoey L.*, 2021 IL App (1st) 210063, ¶ 36. To establish prejudice in a bench trial, Ivelisse would have to show the court's questioning indicated it prejudged the outcome before hearing all of the evidence. *Id.*; see also *In re D.M.*, 2024 IL App (1st) 230508, ¶ 33 (noting, a trial court has more leeway in questioning during a bench trial). That, she cannot do.

¶ 49    Here, at the fitness hearing, the court questioned the witnesses, including Towner, Hobby, Evelyn, Ivelisse, and Cantu, following the parties' direct and cross-examinations. It then

provided lawyers an opportunity to ask follow-up questions. For example, in questioning Towner, the court clarified Ivelisse's participation in anger management, and the circumstances surrounding her suspended visits, including Towner's specific observations. In questioning Hobby, the court asked whether Ivelisse had completed a domestic violence program for perpetrators in particular and clarified that since Hobby had joined the case in March 2023, Ivelisse had not completed any services. Ivelisse's attorney then clarified with Hobby that Ivelisse had *engaged* in individual therapy (although not completed it) and since the McDonald's incident had appropriate visits with the children. The court's questions of Cantu revealed that Ivelisse had told her very few details about the McDonald's incident and omitted her threats to Evelyn or the fact that her visits had been suspended multiple times due to aggressive behavior.[6]

¶ 50   And, in questioning Evelyn, the court clarified how Evelyn came to know Ivelisse given that the record revealed she was a "fictive kin placement," and the children had been in her care for five years.[7] Evelyn then revealed that Ivelisse was the shoplifter who later saw Evelyn in a restaurant, requesting that Evelyn look after her children. Evelyn noted that they were never friends. In following up on Evelyn's testimony on both direct and cross by the Public Guardian that she refused to supervise Ivelisse's visits with her children starting in 2020, the court asked Evelyn whether a specific incident prompted that refusal. Evelyn replied it was Ivelisse's threats to burn down her home and kill herself and the children, which she then memorialized in writing

---

[6]Ivelisse argues the questions to Cantu assumed facts not in evidence because Ivelisse had not yet taken the stand. We reject this argument. Cantu's testimony, although related to Ivelisse, was free-standing. Regardless, Cantu testified that she had reviewed Ivelisse's DCFS chart, which largely contained all the facts referenced by the court. The State also entered the DCFS records into evidence at the start of trial, including the integrated parenting assessment, and various witnesses testified to these facts. The court's questions thus were based on facts in evidence.

[7]"A fictive kin relationship is one that a child has with an individual who is not related by birth, adoption or marriage to a child, but who has an emotionally significant relationship with the child." (Internal quotation marks omitted.) *In re M.C.*, 2024 IL App (1st) 230591-U, ¶ 14, fn. 2; see also *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 25, fn. 1 (same).

to DCFS. The court also asked follow-up questions of Ivelisse, specifically regarding her suspended visits with DCFS and Evelyn, as well as being banned from the agency, all of which related to Ivelisse's testimony on direct and cross.

¶ 51    We have reviewed the record in full, and Ivelisse has not shown she was prejudiced by the trial court's balanced and measured questioning. Far from prejudging the outcome of the proceedings, the court asked follow-up questions that directly related to clarifying the witnesses' direct and cross-examinations. Generally, "[a] trial judge may question witnesses to elicit truth, clarify ambiguities in the witnesses' testimony, or shed light on material issues." *In re N.T.,* 2015 IL App (1st) 142391, ¶ 42. Many questions were open-ended and thus could have inured to Ivelisse's benefit. The court clearly was trying to discern the basis for the State's allegations and to gather information bearing on the current condition and future welfare of the children, which the Juvenile Court Act expressly permits. See 705 ILCS 405/1-2(2) (West 2022); *N.T.*, 2015 IL App (1st) 142391, ¶ 42 (noting, a court may affirmatively ferret out information before it can decide that a child's interest is better served by removal from the family). Nothing in the record indicates that the court was acting as an advocate for the State; instead, it was acting on its statutory and common law authority to gather information to evaluate the credibility of the witnesses, to weigh the evidence, and determine Ivelisse's ability to care for her children and their best interests. There was no abuse of discretion.

¶ 52    In so holding, we reject Ivelisse's contention that the court's questioning at the best interests hearing also demonstrated it had prejudged the case. There, at the conclusion of Ivelisse's testimony (she was the only witness presented by the defense), the court suggested that Ivelisse attempt to repair her relationship with Evelyn for the bests interests of the children. Although the defense had not yet rested, it did not submit any more evidence. The court already

had taken judicial notice of the fitness hearing evidence, wherein it found Evelyn credible and Ivelisse incredible. Although the court had not yet heard the parties' arguments regarding the best interests of the children, the evidence overwhelmingly supported termination of parental rights. Therefore, the court's suggestion at this juncture that Ivelisse work on maintaining contact with her children via the adoptive parent-to-be was harmless, if not appropriate, in the context of this juvenile case. This interchange does not demonstrate that the court prejudged the case, and there was no abuse of discretion.

¶ 53                                              CONCLUSION

¶ 54      For the reasons stated, we affirm the judgment of the circuit court finding Ivelisse unfit to parent her two natural children, J.B. and H.D., and finding it in the children's best interests that her parental rights to them be terminated.

¶ 55      Affirmed.